[L.A. No. 30541. In Bank. Apr. 2, 1976.]

CREDIT INSURANCE GENERAL AGENTS ASSOCIATION OF CALIFORNIA, INC., Plaintiff and Respondent, v. GLEESON L. PAYNE, as Insurance Commissioner, etc., Defendant and Appellant.

## COUNSEL

Evelle J. Younger, Attorney General, Arthur C. de Goede and Richard W. Bakke, Deputy Attorneys General, for Defendant and Appellant.

Mathon & Rosensweig, William Rosensweig and Mark S. Wapnick for Plaintiff and Respondent.

## OPINION

**RICHARDSON, J.**—In this case we consider a challenge to the Insurance Commissioner's authority to issue a regulation, section 2248.14 of title 10 of the California Administrative Code, which limits the amount of commission that may be paid to agents in the sale of credit life and credit disability insurance. We have concluded that the regulation under attack is within the authority of the commissioner.

On or about June 18, 1973, plaintiff Credit Insurance General Agents Association of California, Inc. (hereafter "association"), filed a complaint for declaratory and injunctive relief against defendant Gleeson Payne, as Insurance Commissioner of the State of California. The complaint alleges that the commissioner did not have the statutory authority to regulate the amount of compensation paid to agents in the sale of credit life and credit disability insurance, and that even if the commissioner had such authority, the regulations that were adopted (Cal. Admin. Code, tit. 10, §§ 2248.1-2248.25) impair private contracts and are too vague, overbroad and arbitrary to be fairly applied. The commissioner filed an answer, and thereafter both parties moved for

summary judgment. The commissioner asserted that he had authority to adopt the challenged regulations and did not abuse his discretion in doing so; the association sought summary judgment in its favor only on the issue of the authority of the commissioner to enact section 2248.10 of title 10 of the California Administrative Code. The superior court denied the commissioner's summary judgment motion and granted the motion of the association. The commissioner appealed.

■ "Credit insurance" is insurance purchased by a debtor normally through a creditor as part of a specific loan transaction. Coverage is obtained to assure repayment of the loan. Credit life insurance insures the life of the debtor (Ins. Code, § 779.2, subd. (1)); credit disability insurance provides indemnity for payments due on a transaction while the debtor is disabled (Ins. Code, § 779.2, subd. (2)). Creditors may be authorized to act as insurance agents and deal directly with insurers, or they may work through general agents who are local representatives of out-of-state insurers. (See Ins. Code, §§ 31, 32, 33, 779.2, 779.18, 1600, 1602, 1603, 1622, 1623.)

Sections 2248.1 through 2248.25 of title 10 of the California Administrative Code contain extensive regulations concerning credit life and credit disability insurance. These regulations, among other things, limit premium rates that may be charged to the debtors (§§ 2248.6, 2248.10-2248.13); establish claims review procedures (§ 2248.7); specify duties of creditor/agents (§ 2248.8); and impose disclosure requirements (§ 2248.9). Section 2248.14, subdivision (c), contains, additionally, a provision which limits the percentage which a creditor or general agent selling credit life or credit disability insurance may receive as commission to 35 percent of the net premium (with upward adjustments permitted where additional specified duties are assumed by general agents).

Before section 2248.14 was promulgated, the commissioner conducted a hearing and extensive testimony was introduced regarding the influence of insurance agent commissions on credit insurance. Evidence was presented indicating that because the debtor is in an inferior bargaining position in relationship to the agent—the "captive market" effect—insurers tend to compete by offering successively higher commissions to their agents rather than by extending better insurance coverage to debtors. Thus, in the absence of regulation of these commissions, competition among insurance carriers tends to create pressure to allocate an increasing amount of the premium paid by the debtor for commissions and a decreasing amount of the premium for insurance coverage or

services rendered in connection with this coverage—the "reverse competition" effect. (For discussion of the "captive market" and "reverse competition" effects, see Hubbard, Consumer Credit Life and Disability Insurance (1973) pp. 29-31, 43; Kedzie, Consumer Credit Insurance (1957) pp. 40-41; Note, *Credit Life and Credit Accident and Sickness Insurance—Administrative Regulation of Premium Rates,* 1973 Wis.L. Rev. 943, 944-946; Davis et al., *The Regulation of Consumer Credit Insurance* (1968) 33 Law & Contemp. Prob. 718, 728-739; *Consumer Credit Symposium: Developments in the Law* (1960) 55 Nw.U.L.Rev. 301, 361-363.)

The preamble to the administrative regulations concerning credit insurance reflect in part this concern with the economic effect of "reverse competition" on a "captive market": ". . . (b) In the marketing of credit insurance there have been occasions where the inferior bargaining position of the debtor creates a 'captive market' which, in the absence of appropriate regulation, places the creditor in a position to dictate the choice of coverages, the premium rate, the insurer and agent, with undesirable consequences such as: excessive coverages both as to amounts and duration; excessive charges to debtors; failure to inform debtors of their insurance coverage; and failure to provide debtors the protection purchased by the debtor. (c) In the absence of appropriate regulations, premium rates and compensation for credit insurance tend to be set at levels determined by the rate of return desired by the creditor in the form of dividends, or experience-rating refunds, or in the form of commissions either to the creditor as a licensed insurance agent or to agents or brokers controlled or owned by the creditor instead of on the basis of reasonable cost for the protection provided to the consumer, the debtor. This results in 'reverse competition' which, unless properly regulated by adequate and meaningful regulation of the premium rates charged to the debtor and the amount of compensation received by the creditor, agents and brokers results in inequitable insurance premium charges to debtors which are unreasonably high and not reasonable in relation to the premium charged for the insurance benefits received by debtors, and constitute provisions which are unjust, inequitable and unfair." (Cal. Admin. Code, tit. 10, § 2248.1.)

At the hearing, arguments were also made to the commissioner disputing the validity of the economic assumptions contained in the preamble. The association urged that the law of supply and demand will operate to adjust the compensation of credit insurance agents at an appropriate level, that the private arrangements made between insurers

and their agents have no effect on the coverage obtained by consumers, and that consumers are adequately protected by limitations on the amount of premium that may be charged for certain insurance coverage.

 Bearing in mind the context in which section 2248.14 was promulgated, we turn now to a consideration of its validity. Insurance Code section 779.21 states that the commissioner may adopt ". . . such reasonable rules and regulations as may be necessary to carry out the provisions of [the article relating to credit insurance]." Insurance Code section 779.9 empowers the commissioner to disapprove a credit insurance form "if the benefits provided therein are not reasonable in relation to the premium charge or if it contains provisions which are unjust, unfair, inequitable, misleading, deceptive or encourage misrepresentation of the coverage, or are contrary to any provision of the Insurance Code or of any rule or regulation promulgated thereunder." Insurance Code section 779.1 provides that the provisions of the credit insurance statutes "shall be liberally construed . . . to promote the public welfare by regulating credit life and credit disability insurance."

Together, these statutes grant the commissioner broad discretion to determine what reasonable rules and regulations in the area of credit insurance are necessary to promote the public welfare. The commissioner, of course, has no power to vary or enlarge the terms of an enabling statute (*Knudsen Creamery Co.* v. *Brock* (1951) 37 Cal.2d 485, 492-493 [234 P.2d 26]), or to issue regulations which conflict with this or any other statute. (*Rosas* v. *Montgomery* (1970) 10 Cal.App.3d 77, 92 [88 Cal.Rptr. 907, 43 A.L.R.3d 537].) On the other hand, the absence of any specific provisions regarding the regulation of the compensation of agents does not mean that such a regulation exceeds statutory authority; in our view, it indicates only that the Legislature did not itself desire to determine the proper relationship between this compensation and the effective regulation of the credit insurance market. (See *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 182-183 [70 Cal.Rptr. 407, 444 P.2d 79]; *Mourning* v. *Family Publications Service, Inc.* (1973) 411 U.S. 356, 372-373 [36 L.Ed.2d 318, 331-332, 93 S.Ct. 1652]; *American Trucking Assns.* v. *U. S.* (1953) 344 U.S. 298, 309-310 [97 L.Ed. 337, 355-356, 73 S.Ct. 307].) Courts have long recognized that the Legislature may elect to defer to and rely upon the expertise of administrative agencies (*Ralphs, supra,* at pp. 175-176; *Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 834 [27 Cal.Rptr. 19, 377 P.2d 83]; *Russell* v. *Carleson* (1973) 36 Cal.App.3d 334, 341 [111 Cal.Rptr. 497]).

We have previously described the scope of our review of the issue herein presented. In *Ralphs Grocery Co. v. Reimel, supra,* 69 Cal.2d 172 we said: "In determining whether a specific administrative rule falls within the coverage of the delegated power, the sole function of this court is to decide whether the department reasonably interpreted the legislative mandate." (*Id.,* at p. 176.) In so doing, a court may not substitute its independent judgment for that of the administrative agency on the facts or on the policy considerations involved. (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697]; *L.A.J. Inc.* v. *State Bd. of Equalization* (1974) 38 Cal.App.3d 549, 553 [113 Cal.Rptr. 319].)

■ Under this standard of review, even though an enabling statute authorizes only ". . . such reasonable rules and regulations as may be *necessary* . . ." (Ins. Code, § 779.21, italics added) a court should seek not to determine whether the challenged regulation is strictly "necessary." Instead it must ascertain whether the agency reasonably interpreted its power in deciding that the regulation was necessary to accomplish the purpose of the statute. Stated another way, the court's role is limited to determining whether the regulation is "reasonably designed to aid a statutory objective." (*Schenley Affiliated Brands Corp.* v. *Kirby* (1971) 21 Cal.App.3d 177, 187 [98 Cal.Rptr. 609]; see *Pacific Motor Transport Co.* v. *State Bd. of Equalization* (1972) 28 Cal.App.3d 230, 239 [104 Cal.Rptr. 558].)

■ In the process of exercising our review power we bear in mind that the burden of proof is on the party challenging the regulation. "The agency's action comes before the court with a presumption of correctness and regularity, which places the burden of demonstrating invalidity upon the assailant." (*California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800, 810, fn. omitted [84 Cal.Rptr. 590, 85 Cal.Rptr. 735]; see *Ralphs Grocery Co.* v. *Reimel, supra,* 69 Cal.2d 172, at p. 175; *Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 330-331 [253 P.2d 659]; *Mission Pak Co.* v. *State Bd. of Equalization* (1972) 23 Cal.App.3d 120, 125 [100 Cal.Rptr. 69]; *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 594-595 [71 Cal.Rptr. 739].) Thus, in this case the association has the burden of demonstrating that the evidence on which the commissioner relied does not reasonably support the regulation in light of the purposes of the statute. This burden has not been met.

As we have noted, Insurance Code section 779.21 authorizes regulations that may be necessary to carry out other statutory provisions relating to credit insurance. The objectives of these provisions, which should be interpreted broadly to promote the public welfare (Ins. Code, § 779.1), include assuring that the insurance benefits provided to the debtor are reasonable in relation to the premium charged for credit insurance (Ins. Code, § 779.9). In our view, the commissioner could reasonably believe, on the basis of the aforementioned testimony presented to the agency and summarized in his decision (Decision of Insurance Commissioner, Ruling No. 186, File No. RH-153 (1973) at pp. 10-21) that the limitation on the compensation received by agents is necessary to protect the debtor and assure that the benefits he receives are reasonable in relation to the premium.

It is not our role to pick and choose among various economic theories and to invalidate a regulation on the basis of our own preference. Even if alternative regulations would better satisfy the statutory objectives, we must conclude, that unless the challenged regulation is unreasonable in light of discernible statutory objectives, it is valid. We cannot find that the commissioner unreasonably interpreted the legislative mandate herein.

*Pac. Tel. & Tel. Co.* v. *Public Utilities Com.* (1950) 34 Cal.2d 822 [215 P.2d 441], on which the dissenting opinion relies, does not fairly support its position that the commissioner herein acted in excess of its statutory authority. This case concerned primarily an attempt by the Public Utilities Commission to exercise control over contracts between affiliated utility corporations. We held that the commission did not have the authority to prescribe certain specific terms of contracts between affiliates, such as the types of services which are reasonably required by the parent company and the specific amount which should be paid as the "base and starting point" to cover services rendered by the subsidiary. (*Id.,* at pp. 824-825.)

We stated in that case, however, that the commission did have the power to regulate both ". . . the manner in which the utility provides the required services to safeguard the utility's ability to serve the public efficiently at reasonable rates; . . ." (*id.,* at p. 827), and the " '. . . amount that is to be allowed in operating expenses as payment to the parent company for services rendered, . . .' " (*Id.,* at p. 830.) The regulation before us in the present case, which limits the commission received by

agents for the performance of various services, falls within the general scope of permissible regulations as expressed in *Pac. Tel. & Tel. Co.* The regulation in question does not specify the types of services which may be performed by agents or require that the payments to agents be made according to a specified time schedule. It regulates only the rate that may be paid for certain services.

In any event, regardless of the principles which may be derived from *Pac. Tel. & Tel. Co.* v. *Public Utilities Com., supra,* 34 Cal.2d 822, we are persuaded to follow the standards announced by us in *Ralphs Grocery Co.* v. *Reimel, supra,* 69 Cal.2d 172, decided 18 years after *Pac. Tel. & Tel. Co.* Guided by these principles, we conclude that the regulation is valid.

The judgment is reversed and the cause remanded to the trial court with directions to enter judgment for defendant.

Wright, C. J., McComb, J., Tobriner, J., and Sullivan, J., concurred.

**MOSK, J.**—I dissent.

The Insurance Commissioner may have an arguable economic rationale for desiring to limit the amount of commission that may be paid to agents in the sale of credit life and credit disability insurance. In reliance upon his finding, however questionable, he could act by fiat if ours were a total bureaucratically controlled economy. But the problem here, in our government of laws, is that in invading this previously uncontrolled field the commissioner can cite no direct legislative authority justifying an enforceable order. The majority opinion adds nothing other than an *ipse dixit* approval.

The commissioner relies on two very general authorizations of power: Insurance Code sections 779.1 and 779.21. The former grants him the right to regulate "credit life insurance and credit disability insurance," while the latter permits reasonable rules to carry out the provisions of the article. Neither, however, defines the scope of the commissioner's authority. While the power to regulate the relationship between debtor and insurer may be deduced from these general authorizations, it does not rationally follow that the commissioner may limit compensation to be paid to insurance companies' employees or independent contractors, whether they be secretaries, telephone operators or general agents.

The only specific provision of the code that the commissioner points to—section 779.9—offers little comfort to him. The section provides: "The commissioner shall within 30 days after the filing of any such policies, certificates of insurance, notices of proposed insurance, applications for insurance, endorsements and riders, disapprove any such form if the benefits provided therein are not reasonable in relation to the premium charge." On its face, the section appears to grant the commissioner the power to disapprove insurance policies only, not contracts between insurance companies and third parties.

Nor do any of the cases cited by the majority support an enlargement of that authority. The cases merely instruct that in areas within an administrative agency's statutory grant of power courts must accord administrative regulations every presumption of validity. In the present case, this court must accept the commissioner's factual finding that a limit on the commissions which agents may receive will benefit those buying credit insurance. However, we are not bound to find that an adopted regulation is within the scope of statutory power.

Indeed, the only California case on point leads to the converse conclusion. In *Pac. Tel. & Tel. Co.* v. *Public Utilities Com.* (1950) 34 Cal.2d 822 [215 P.2d 441], this court struck down a Public Utilities Commission (PUC) order similar to that promulgated by the commission in this case. Pacific was paying a substantial service fee to its parent company, American Telephone and Telegraph Company (AT&T). The PUC, finding that excessive fees could have an adverse effect on telephone users, set strict limits on the fees that Pacific could pay to AT&T. However, Justice Traynor, speaking for the majority, concluded that even though the Public Utilities Act accorded the PUC wide power to regulate the provision of services to consumers, it did not "specifically grant to the commission power to regulate the contracts by which the utility secures the labor, materials, and services necessary for the conduct of its business, whether such contracts are made with affiliated corporations or others." (*Id.*, at p. 827.)

Striking similarities can be found between *Pacific Telephone* and the case at bar. First, in each case a regulatory agency acted under broad grants of power directed towards affecting the services provided to consumers. The only substantive difference between the enabling statutes in *Pacific Telephone* and those in the present case may be that the former statutes accorded the PUC *more* authority than the present statutes grant the Insurance Commissioner. The PUC was vested with

the power " 'to supervise and regulate every public utility in the state and to do all things, whether herein specifically designated or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction.' " (*Id.,* at p. 828.) Moreover, the PUC was specifically entitled not only to determine proper rates, but also to determine whether " 'the rules, regulations, practices or *contracts* . . . are unjust, unreasonable, discriminatory or preferential, . . .' " (Italics added.) (*Ibid.*) Thus, in contrast to the matter before us, a literal reading of the enabling statutes in *Pacific Telephone* may have led to the conclusion that the regulatory agency had supervision over contracts between the regulated industry and third parties.

Second, both cases involve an attempt by a regulatory agency to curtail a practice believed to endanger indirectly the quality of services provided to consumers. In *Pacific Telephone,* the PUC feared that excessive fees paid by Pacific to its parent company would inevitably lead to higher rates imposed upon telephone users or might prevent a lowering of rates. Even if rates were not affected, there was a danger that AT&T would extract such exorbitant sums from Pacific that the latter would face insolvency and would be unable to obtain the capital needed for continuous expansion of service to its customers. (See dissenting opn. by Carter, J., 34 Cal.2d at pp. 834-837.) In the present case, as the majority notes, the rationale for the commissioner's regulation is that if insurance companies spend their limited resources competing with each other in the amount of commissions paid to agents, they will not be able to compete with each other in providing better services to debtors at lower premium rates. Each rationale is the type of economic administrative factual conclusion beyond review by the judiciary.

Third, in each case it is clear the Legislature had the power to adopt a rule identical to that promulgated by the administrative agency, but had not done so. The question in each case is legislative interpretation, not legislative power. (*Id.,* at p. 826; *O'Gorman & Young* v. *Hartford F. Ins. Co.* (1931) 282 U.S. 251 [75 L.Ed. 324, 51 S.Ct. 130, 72 A.L.R. 1163] (legislative limit on insurance agents' commissions upheld against constitutional attack).)

Fourth, in neither case was the administrative agency powerless to confront the perceived problem. The PUC in *Pacific Telephone* could "prevent a utility from passing on to the ratepayers unreasonable costs for materials and services" (34 Cal.2d at p. 826); such a remedy was not wholly satisfactory for it did not resolve the problem of potential AT&T

raiding of Pacific's treasury leading to insufficient capital for expansion of services. In the case at bar, the Insurance Commissioner has considerable power to affect premiums paid by and the services provided for debtors. He holds the power—and has exercised it—to place a ceiling on premiums that can be charged to debtors. (Cal. Admin. Code, tit. 10, § 2248.11 et seq.) Moreover, in response to concern over the quality of services provided to the debtor, the commissioner has incorporated into the rate structure a requirement that insurance companies, over a specified period of time, must pay back as claims at least 50 percent of the total amount spent for premiums. If there is still concern that competition in regard to agents' commissions will lead to deterioration in services, further direct regulation of services may be considered.

Finally, underlying both *Pacific Telephone* and the present case is the concept that administrative agencies, unless specifically directed to by statute, should not interfere with the private ordering of parties. Insurance companies have a right to compete for agents, and agents have a right to contract at arm's length with insurance companies. Indeed, section 779.1 carries a caveat that "Nothing in the article is intended to prohibit or discourage reasonable competition." This right can be abridged by specific legislation, but in the absence of such legislation the fact that the service of insurance companies might be affected by a contract does not entitle an administrative agency to curtail or invalidate the instrument. As we noted in *Pacific Telephone,* almost every contract a company makes is bound to affect its rates and services. (*Id.,* at p. 828.) Indeed, going one step further, almost any decision made by an insurance company will bear on its rendering of services. But until the Legislature provides that every decision by an insurance company is subject to regulatory review, this court should not permit gratuitous bureaucratic imposition upon the company-agency relationship on a vague theory that service might arguably be affected.

In the absence of specific legislative authorization, the commissioner has no power to interfere with the freedom of parties, dealing in arm's length parity, to contract in accordance with the normal economic factors that induce one party to pay and one to receive.

I would affirm the judgment.

Clark, J., concurred.

Respondent's petition for a rehearing was denied May 6, 1976. Mosk, J., and Clark, J., were of the opinion that the petition should be granted.