[Civ. No. 25374. Third Dist. Jan. 20, 1987.]

ELODIA JIMENEZ et al., Plaintiffs and Appellants, v.
BILL HONIG, as Superintendent, etc., et al., Defendants and Respondents.

COUNSEL

Richard Gillespie, Pearl, McNeil & Gillespie, Herman Sillas, Andrea Rosen, Ochoa & Sillas, Mario Rodriguez, Ellen M. Peter, Debra Loya, Peter Roos and Stefan Rosenzweig for Plaintiffs and Appellants.

Joseph R. Symkowick and Taylor S. Carey for Defendants and Respondents.

OPINION

**PUGLIA, P. J.**—Plaintiffs appeal from the denial of a preliminary injunction to restrain defendants from implementing a 1985 amendment to section 4306 of title 5 of the California Administrative Code (regulation 4306). (See Gov. Code, § 11350; Code Civ. Proc., § 526a.) At issue is whether the standards in regulation 4306 for reclassifying limited English-proficient students conflict with Education Code section 52164.6.[1] We find no conflict and therefore shall affirm.

I

An appeal from an order denying a preliminary injunction normally is confined to determining whether the trial court abused discretion in weighing the respective equities of the parties pending trial. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889]; see also *IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121]; *California Satellite Systems, Inc.* v. *Nichols* (1985) 170 Cal.App.3d 56, 63-64 [216 Cal.Rptr. 180].) However, where the issue on appeal is solely a question of law, the reviewing court may consider the merits of the controversy. (*North Coast Coalition* v. *Woods* (1980) 110 Cal.App.3d 800, 804-805 [168 Cal.Rptr. 95]; *Faunce* v. *Denton* (1985) 167 Cal.App.3d 191, 195 [213 Cal.Rptr. 122].) On appeal, plaintiffs' only claim is that regulation 4306 as amended is facially invalid as in conflict with section 52164.6. We shall resolve this legal question despite the interlocutory nature of the judgment.

II

The California Bilingual-Bicultural Education Act of 1976 (§ 52160 et seq.) recognizes the need to take appropriate action to overcome English

---

[1]Further references to sections of an unspecified code are to the Education Code.

language barriers which impede a student's "equal" participation in the public school system. (§ 52161.) Under the act, the language abilities of students whose primary language is other than English are assessed when the student first enrolls in school. (§§ 52163, 52164, 52164.1.) Students who do not have clearly developed English language skills are classified as students of "limited English proficiency" (LEP) and are enrolled in a bilingual program suitable to their grade level and needs. (§§ 52163, 52165.) When LEP students are determined to have developed the English language skills necessary to succeed in an English-only classroom at a level substantially equivalent to their peers, they are "reclassified" and transferred into the mainstream curriculum program. (§ 52164.6, as added Stats. 1980, ch. 1339, § 16.)

Section 52164.6 provides for a multicriteria reclassification process and requires the State Board of Education (Board) to adopt regulations setting forth standards to guide the local school districts in establishing those criteria. The section specifies four "criteria" which the Board must "utilize" in developing its regulations. They are (1) "Teacher evaluation, including a review of the pupil's curriculum mastery" (subd. (a)); (2) "Objective assessment of language proficiency and reading and writing skills" (subd. (b)); (3) "Parental opinion and consultation" (subd. (c)); and (4) "An empirically established range of performance in basic skills, based on nonminority English-proficient pupils of the same grade and age, which demonstrates that the pupil is sufficiently proficient in English to succeed in an English-only classroom" (subd. (d)).[2]

---

[2]Education Code section 52164.6 reads in full: "Reclassification criteria shall be established by each school district in which pupils of limited English proficiency are enrolled. The criteria shall determine when pupils of limited English proficiency have developed the English language skills necessary to succeed in an English-only classroom. The reclassification process shall, at a minimum, utilize multiple criteria, including, but not limited to, all of the following:

"(a) Teacher evaluation, including a review of the pupil's curriculum mastery.

"(b) Objective assessment of language proficiency and reading and writing skills.

"(c) Parental opinion and consultation.

"(d) An empirically established range of performance in basic skills, based on nonminority English-proficient pupils of the same grade and age, which demonstrates that the pupil is sufficiently proficient in English to succeed in an English-only classroom.

"The board shall, no later than April 1, 1981, adopt regulations setting forth standards of language reclassification criteria to be adopted by school districts. The board's regulations shall, at a minimum, prescribe a reclassification process which shall utilize multiple criteria as required by this section.

"The superintendent shall, [by] May 1, 1981, prepare and distribute to each school district in which pupils of limited English proficiency are enrolled, background material and guidelines for language reclassification criteria to be adopted by school districts.

"Each school district shall, in following the board's regulation, no later than September 1, 1981, establish criteria for determining when pupils of limited English proficiency enrolled in programs defined in Section 52163 have developed the English language skills of comprehension, speaking, reading, and writing necessary to succeed in an English-only instructional setting."

In 1982, the Board adopted regulation 4306 pursuant to the statutory mandate. As originally adopted the regulation included a baseline requirement that no student could be reclassified unless he scored above a certain percentile on a norm-referenced or other standardized test. (Reg. 4306, subd. (b)(4) as adopted in 1982.)[3]

---

[3]Before the 1985 amendment, regulation 4306 read in full: "The language reclassification criteria, standards and procedures to be established by the governing board of each school district shall, at a minimum consist of the following components:

"(a) A responsible administrative mechanism for the effective and efficient conduct of the language reclassification process such as,

"(1) a language appraisal team,

"(2) provisions for notice to parent(s) or guardian(s) of their legal right to challenge decisions of placement and language reclassification, and reasonable efforts to encourage their participation in the district's reclassification procedure,

"(3) specification of the participation of the pupil's bilingual teacher, bilingual program administrator, and school site administrator in the language reclassification process,

"(4) monitoring the progress of pupils reclassified to ensure correct classification and placement, and

"(5) documentation of multiple criteria information, participants and decisions of reclassification in the pupil's permanent records.

"(b) Multiple criteria with appropriate cut-off scores for assessing the pupil's skills which include:

"(1) documented teacher evaluation of the pupil's English language proficiency, including a review of the pupil's mastery of the English language curriculum for the appropriate grade level,

"(2) objective assessment of the pupil's oral English proficiency using test(s) designated by the Superintendent and using a cut-off score of fluent English speaking established by the publisher for this purpose,

"(3) parental opinion and consultation, and

"(4) objective assessments in English language areas, reading, writing and mathematics using one of the following tests and procedures of proven validity and reliability:

"(i) norm-referenced test with cut-off scores of not less than the thirty-sixth percentile based on national norms or the distribution of scores derived from a representative pupil sample of nonminority English proficient pupils of the same age and grade; or

"(ii) norm-referenced test with cut-off scores between the thirty-first and thirty-fifth percentile based on national norms or on the distribution of scores derived from a representative pupil sample of nonminority English proficient pupils of the same age and grade provided that the school or district's language appraisal team, with the pupil's parents' or guardians' agreement, judges the pupil to have English language skills necessary to succeed in an English-only classroom and is provided appropriate supportive instructional services in language arts, reading, writing and mathematics, or

"(iii) in the case that the fiftieth percentile of the nonminority district population of the local education agency is lower than the thirty-sixth percentile of the national norm, the cut-off score shall be no lower than three percentile points below the local norm; or

"(iv) standardized criterion referenced tests for basic skills assessment, including curriculum mastery of language arts, reading, writing and mathematics at the grade level equivalent to nonminority pupils provided that such procedures are approved by the Department and meet the purpose, intent and requirements of Education Code Section 52164.6 in accordance with guidelines established by the Department.

"Nothing contained herein is to be construed as authorizing or permitting districts to establish low or differential standards of linguistic or academic performance of students affected by the language reclassification process. School districts shall be responsible for determining that pupils so reclassified meet all of the criteria and are, in fact, pupils of fluent English proficiency as defined in Education Code Section 52163(n)."

As a part of the Educational Reform Act of 1983, the Legislature directed the Board and the Superintendent of Public Instruction to review regulation 4306 and make "specific recommendations for any necessary changes. . . ." (Stats. 1983, ch. 498, §§ 1, 231.) As Superintendent of Public Instruction, defendant Bill Honig appointed a language reclassification advisory committee composed of 30 persons to assist in the review. After the committee submitted its report and public hearings were held on the matter, the Board (the members of which are named individually as defendants) approved an amendment to regulation 4306 which allowed greater local flexibility. The amendment became effective in May of 1985.[4] As amended in 1985, regulation 4306 keeps the former provisions intact but adds to subdivision (b) a subpart (5) which reads: "Notwithstanding the results obtained in the tests and procedures described in subpart (4) of this subdivision, the language appraisal team may reclassify a pupil, provided that: [¶] (i) the pupil has been enrolled in a bilingual program for at least three years, and has received English reading instruction in an organized program during the last year, and [¶] (ii) the language appraisal team, after reviewing the assessment and all pupil performance data obtained pursuant to the provisions of the section, determines that the pupil has acquired sufficient English language skills necessary to succeed in an English-only classroom, and [¶] (iii) the language appraisal team specifies any instructional support services necessary for the pupil to succeed in an English-only classroom, and [¶] (iv) the pupil's parent or guardian consents to reclassification."

The 1985 amendment also adds a subdivision (c), which reads: "The number of pupils reclassified and district level procedures for reclassification shall be reported annually to the Department in a form and manner prescribed by the Superintendent." To subdivision (a)(3) the amendment adds "regular classroom teacher" to the list of specified participants in the language reclassification process.

### III

We first examine the language of the statute. Only if the language does not clearly disclose the intent of the Legislature do we turn for guidance to legislative history and the general principles and policies underlying the statutory scheme. (See *Miller* v. *Woods* (1983) 148 Cal.App.3d 862, 876-877 [196 Cal.Rptr. 69]; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d

---

[4]The Office of Administrative Law (OAL) disapproved the amendment as being inconsistent with section 52164.6. (See Gov. Code, § 11349.1.) However, the Governor subsequently overruled OAL's decision. (See Gov. Code, § 11349.5.) The courts are precluded from considering either the opinion of the OAL or the Governor in reviewing the validity of the regulation. (Gov. Code, § 11350, subd. (c).)

222, 230-231 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Leroy T.* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 438 [115 Cal.Rptr. 761, 525 P.2d 665].)

Section 52164.6, requiring the Board to set "standards" for reclassification, expressly delegated to the Board the legislative power exercised in the adoption of regulation 4306. ■ In reviewing the legality of quasi-legislative administrative rulemaking, the judicial function is limited to deciding whether the regulation is consistent with and not in conflict with the enabling statute, and reasonably necessary to effectuate its purpose. (*Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 355 [185 Cal.Rptr. 453, 650 P.2d 328]; *Woods* v. *Superior Court* (1981) 28 Cal.3d 618, 679 [170 Cal.Rptr. 484, 620 P.2d 1032]; *Credit Ins. Gen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651, 657 [128 Cal.Rptr. 881, 547 P.2d 993]; see also Gov. Code, § 11342.1.) Under this standard of review, the regulation is credited with a strong presumption of correctness. (*Credit Ins. Gen. Agents, supra,* at p. 657.) As long as the administrative agency does not abridge or enlarge the authority conferred by the statute, the courts will defer to the expertise of the agency in its discretionary rulemaking capacity and will not substitute their own policy judgment for that of the agency. (*Ford Dealers Assn., supra,* at p. 355; *Ontario Community Foundations, Inc.* v. *State Bd. of Equalization* (1984) 35 Cal.3d 811, 816-819 [201 Cal.Rptr. 165, 678 P.2d 378]; see also Gov. Code, § 11340.1.)

IV

■ Plaintiffs have no quarrel with regulation 4306 as originally adopted. Instead, they focus on the amendment, which in subdivision (b)(5), allows a "language appraisal team" to reclassify a student after three years in a bilingual program, irrespective of standardized test results. Plaintiffs submit that in place of the "empirically established range of performance" standards which section 52164.6 identifies as a reclassification criterion which a district "shall, at a minimum, utilize," the amendment substitutes the subjective and unbridled judgment of a local "team" whose membership is not expressly defined. Plaintiffs assert this is inconsistent with the statutory requirement that the reclassification process include an *objective* comparison of the child's basic skills with those of his English-proficient peers. (See § 52164.6, subd. (d).)

Plaintiffs' interpretation of the statute is not compelled by its plain words. Section 52164.6 neither specifies, nor requires the Board to set, immutable benchmarks for any of the four specified criteria against which an individual student must always be judged. Nor does it elevate any one criterion over

the others. The statute merely directs the Board to "utilize" all four criteria, as well as any others which the Board considers pertinent to the reclassification process. "Utilize" means to make use of beneficially or profitably. (See Webster's New Internat. Dict. (3d ed. 1971) p. 2525.) Plaintiffs' interpretation of section 52164.6 would subordinate that provision's first three criteria to that specified in subdivision (d), rendering the former parts of the statute surplusage and depreciating their utilization in the reclassification process.

■ The Board asserts, and we agree, that the Legislature intended to define the minimum analytical resources the Board must incorporate into the reclassification standards, but otherwise left the Board discretion as to *how* those resources are best used.

The record indicates that the amendment to regulation 4306 was a considered reaction to responses from school district personnel and other educators that rigid numerical cutoff scores were unreliable as the *sole* indicator of a student's language performance skills. Although such scores tend to correlate with English proficiency, some students perform poorly on standardized tests for various other reasons, such as test anxiety and curricular environment.[5] Under the original regulation, too many children who stood to benefit from the curriculum available in an English-only program were unfairly denied that opportunity. In the Board's view, the amendment permitted the necessary flexibility to consider norm-referenced test results in conjunction with *all other* equally relevant factors bearing on reclassification. As expressed by defense counsel: "In order to meet the educational needs of each student, reclassification criteria must be broad enough to encompass all significant factors bearing on performance, not simply those most easily identified. This is the clearest reason for the statutory requirement for utilization without limitation of multiple criteria."

If the Legislature had intended that LEP students be reclassified only upon a specific demonstration of proficiency based on norm-referenced or any other tests, it could have said so. Since it did not, tempering absolute test scores with first-hand teacher evaluation seems a justifiable administrative

---

[5]Norm-referenced tests are based on comparisons to an identified norm. The normal distribution of scores, which are curved, consigns examinees to every point of the curve from the lowest to the highest and always relegates some examinees to positions below a certain percentile. Because the scores of LEP students on norm-referenced tests are based on the performance of nonminority students, their scores tend to be lower than those of their English-proficient counterparts. But lack of English proficiency is not necessarily the cause of poor test performance. Some students whose primary language is English score, according to the normal distribution, below a certain percentile for reasons other than language deficiency. Were these very same English-speaking students placed in a bilingual classroom where exit eligibility is determined by their test scores alone, they would be ineligible for reclassification.

accommodation to serve the needs of individual students in their particular educational environment.

The additional flexibility given the language appraisal team in evaluating students does not, perforce, sacrifice the requisite empiricism and objectivity. Regulation 4306, subdivision (b)(5)(ii) expressly provides for a review of "all performance data obtained" in the reclassification process. These include documented teacher evaluation of the student's English language proficiency (subd. (b)(1) which mirrors § 52164.6, subd. (a)) and objective assessment of the student's oral English proficiency using tests designed by the Superintendent of Public Instruction (subd. (b)(2) which mirrors § 52164.6, subd. (b)) as well as due consideration to the student's performance on norm-referenced tests. Moreover, it is apparent from subdivision (a)(3) of regulation 4306, as interpreted by the Board during public hearings, that the language appraisal team must minimally consist of the student's bilingual teacher, bilingual program administrator, regular classroom teacher, and school site administrator. Based on their experiences and firsthand observations, the student's bilingual teacher and the regular classroom teacher are in an optimal position to assess the student's individual capabilities in relation to students enrolled in the regular classroom.

Finally, the addition of subdivision (b)(5) to the subject regulation left intact the command of subdivision (b)(4)(iv), providing in pertinent part: "School districts shall be responsible for determining that pupils so reclassified meet all of the criteria and are, in fact, pupils of fluent English proficiency as defined in . . . Section 52163(n)." Section 52163, subdivision (n) defines "pupils of fluent English proficiency" as "pupils whose English proficiency is comparable to that of the majority of pupils, of the same age or grade, whose primary language is English." Thus, the amended regulation continues to demand fluency in English as a prerequisite to reclassification.

There are procedural safeguards against premature and unwanted reclassification. At the outset, the students must have been in a bilingual program at least three years, the last year of which provided English reading instruction. (Reg. 4306, subd. (b)(5)(i).) Second, the language appraisal team must make a specific determination that the student is able to succeed in an English-only classroom. (Reg. 4306, subd. (b)(5)(ii).) Documentation of that determination is necessary because section 52164.5 independently requires school districts to retain "Pertinent information from the assessment of language skills for each pupil whose primary language is other than English" and to report annually "the number of pupils who have met the . . . exit criteria pursuant to Section 52164.6." (See also reg. 4306, subds. (a)(5) and (c).) Third, the team must specify any instructional support services neces-

sary to success. (Reg. 4306, subd. (b)(5)(iii).) Finally and foremost, the student's parent or guardian must consent to reclassification. (Reg. 4306, subd. (b)(iv).)[6]

Plaintiffs are dissatisfied because, under the amended reclassification scheme, ultimate responsibility for appropriate decisionmaking rests with the local school districts. But this fault, if it be a fault, is sanctioned by the governing statute, which begins: "Reclassification criteria shall be established *by each school district* in which pupils of limited English proficiency are enrolled. The criteria shall determine when pupils of limited English proficiency have developed the English language skills necessary to succeed in an English-only classroom. . . ." (§ 52164.6, italics added.)

Plaintiffs also complain that, under the new classification procedures, parents must take affirmative steps to counter the language appraisal team's recommendation or face reclassification of their children against their wishes. But, as defendants point out, this is inaccurate. Because the children are already in the bilingual program, parents need not fight to retain them there. If parents disagree with the language appraisal team's recommendation, they need do nothing more than withhold their consent and the reclassification process terminates.

Contrary to plaintiffs' position, the legislative history of section 52164.6 does not support an inference that the Legislature specifically intended to reject the reclassification procedure embodied in amended regulation 4306. When originally introduced as an addition to the Bilingual-Bicultural Education Act, section 52164.6 read in pertinent part: ' '[E]ach school district shall, no later than September 1, 1980, establish criteria for determining when pupils, of limited English proficiency, enrolled in programs under Section 52163, have developed the English language skills of comprehension, speaking, reading and writing necessary to succeed in an English-only classroom. [¶] If any pupil of limited English proficiency has been enrolled for two years in a program under Section 52163, that pupil shall be assessed to determine (1) the need for continued services under this article and (2) the most appropriate program for providing such services. This evaluation shall be based on the exit criteria required under this section, and such other criteria as the district may select." (Assem. Bill No. 507 (1979-1980 Reg. Sess.) § 9, as amended in Sen., July 9, 1979.) The present version of the statute does require more state involvement on the part of the Board than did this earlier version. Yet, as previously discussed, the codi-

---

[6]Participation in the bilingual program also is a purely voluntary decision on the part of a student's parent or guardian. (§ 52161.)

fied section also represents a clear vesting of responsibility in the Board to develop reclassification standards and does not dictate what those standards are to be. Following that legislative mandate and the guidelines in the statute, the amendment does prescribe standards and procedures to which the language appraisal team must adhere before reclassifying a student whose standardized test scores fall below identified cutoffs. In other words, the change in the language of the statute signifies no more than the Legislature's recognition of the Board's expertise in matters of educational programs and policies. Whether the Board chose wisely to subdelegate some discretionary responsibility to the local team is not for the courts to decide.

Plaintiffs describe the regulatory amendment as amounting to a "waiver" of reclassification criteria. They point out that the Legislature enacted, in 1982, a general waiver law authorizing the Board to waive many Education Code provisions upon application of a school district. (§ 33050, as added Stats. 1982, ch. 1298, § 1.) But the Legislature expressly declared section 52164.6 unwaivable. (Former § 33050, subd. (2), now § 33050, subd. (a)(8).) The fallacy of plaintiffs' logic lies in the fact that no statutory criterion has been waived if, as we decide, the Board properly and reasonably followed the legislative mandate.

Manifestly, the Legislature did not intend to lock LEP students irretrievably into a separate system of education apart from the regular classroom. In a policy statement prefatory to the operative provisions of the Bilingual-Bicultural Education Act, the Legislature expressly found and declared that the "primary goal" of the bilingual program " . . . is, as effectively and efficiently as possible, to develop in each child fluency in English." (§ 52161, as amended Stats. 1980, ch. 1339, § 5.) This goal is fully commensurate with federal policy to provide bilingual students an equal educational opportunity. Said the United States Supreme Court in *Lau* v. *Nichols* (1974) 414 U.S. 563, 568 [39 L.Ed.2d 1, 6, 94 S.Ct. 784]: " 'Any ability grouping or tracking system employed by the school system to deal with the special language skill needs of a national origin-minority group must be designed to meet such language skill needs as soon as possible and must not operate as an educational deadend or permanent track.' " (Quoting from a 1970 Dept. of Health, Ed., and Welf. guideline.)[7]

In conclusion, we hold the amendment to regulation 4306 is facially consistent with section 52164.6. Although there may be more than one plau-

---

[7]*Lau* v. *Nichols, supra,* held that the failure of a school district which received federal financial assistance to provide English language instruction to 1,800 LEP students constituted unlawful discrimination under section 601 of the Civil Rights Act of 1964 (42 U.S.C. § 2000d; *Lau, supra,* at pp. 568-569 [39 L.Ed.2d at p. 6]).

sible interpretation of that section, we believe the one adopted by the administrative implementers is eminently reasonable.

The order denying the preliminary injunction is affirmed.

Evans, J., and Sims, J., concurred.