[No. B053678. Second Dist., Div. Five. May 24, 1991.]

BRYAN NICOLLE-WAGNER, Plaintiff and Appellant, v.
GEORGE DEUKMEJIAN, as Governor, etc., et al., Defendants and
Respondents.

**COUNSEL**

Bryan W. Nicolle-Wagner, in pro. per., for Plaintiff and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Andrea Sheridan Ordin and Roderick E. Walston, Chief Assistant Attorneys General, Theodora P. Berger, Assistant Attorney General, Craig C. Thompson, Clifford Rechtschaffen and Edward G. Weil, Deputy Attorneys General, for Defendants and Respondents.

Munger, Tolles & Olson, Carolyn B. Kuhl, Covington & Burling, Peter Barton Hutt, Bruce N. Kuhlik and Sarah E. Taylor as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**GRIGNON, J.**—This appeal concerns the Safe Water and Toxic Enforcement Act of 1986 (Proposition 65), enacted by the voters of this state during the 1986 general elections. At issue is whether a regulation promulgated by the Health and Welfare Agency pursuant to the act conflicts with the language of the act, and whether that regulation is reasonably necessary to effectuate the purposes of the act. On cross-motions for summary judgment, the trial court determined, as a matter of law, that the regulation at issue was reasonable, was the product of fair administrative procedures, and that the Health and Welfare Agency acted within the scope of its statutory authority in enacting the regulation. We affirm.

### FACTS AND PROCEDURAL BACKGROUND

Proposition 65 was a ballot measure entitled, "Restrictions on Toxic Discharge into Drinking Water; Requirement of Notice of Persons' Exposure

to Toxics." Its purpose was to identify chemicals known to cause cancer or birth defects, and to prevent exposure to those chemicals through our water supplies, in the workplace, and by other means. Passage of Proposition 65 added sections 25249.5 through 25249.13 to the Health and Safety Code, effective January 1, 1987. Section 25249.5 is a prohibition on contaminating drinking water with chemicals known to cause cancer or reproductive toxicity. Section 25249.6 requires a "clear and reasonable" warning before one may lawfully expose a person to chemicals which are known to cause cancer or reproductive toxicity. That section provides: "[N]o person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual, except as provided in section 25249.10." On or before March 1, 1987, the Governor was charged with the duty to publish a list of chemicals known to the state to cause cancer or reproductive toxicity. In 1988, almost 300 chemicals were on the list. Section 25249.12 provides that the Governor shall designate a "lead agency" to implement the provisions of Proposition 65. That lead agency is empowered to adopt and modify regulations, standards, and permits, as necessary, in order to conform with and implement the purposes of the initiative statute. The Governor designated the Health and Welfare Agency (the Agency) as the "lead agency" for purposes of Proposition 65.

On April 29, 1987, a petition was submitted to the Agency by 20 different groups, including amicus curiae herein, the Grocery Manufacturers of America, Inc. That petition sought to exempt from the section 25249.6 "clear and reasonable" warning requirement all food products which comply with certain federal safety regulations. The petition included a compilation of the extent to which various food products contain naturally occurring carcinogens or reproductive toxins. The compilation lists over 300 types of foods which, according to the 16 referenced scientific articles, contain some amount of listed chemicals such as arsenic, chromium, lead, selenium, nickel, cadmium, benzene, benz(a)pyrene, or benz(a)anthracene. Some of these chemicals, like arsenic, selenium, nickel, and cadmium are essential for human nutrition at low levels. In addition, the petition emphasized that some food products contain a naturally occurring carcinogen, aflatoxin, despite existing regulatory efforts. Aflatoxin is a mold that grows in grains and peanuts in storage. It is produced by two common fungi, Aspergillus flavus and A. parasiticus. The federal government has established an "acceptable level" for aflatoxin.

The Agency issued a notice of proposed rulemaking and conducted a public hearing concerning a regulation to exempt from the warning require-

ment all naturally occurring chemicals in food products which have been identified as causing cancer or birth defects pursuant to section 25249.8. Various draft and emergency regulations were proposed. Effective July 8, 1988, the final regulation became effective. (Cal. Code Regs., tit. 22, § 12501,[1] div. 2, pt. 2, ch. 3.)

Section 12501 provides that, "[h]uman consumption of a food shall not constitute an 'exposure' for purposes of Health and Safety Code section 25249.6 to a listed chemical in the food to the extent that the person responsible for the contact can show that the chemical is naturally occurring in the food." A chemical is considered "naturally occurring" if "it is a natural constituent of a food, or if it is present in a food solely as a result of absorption or accumulation of the chemical which is naturally present in the environment in which the food is raised, or grown, or obtained . . . ." The chemical is not naturally occurring to the extent that it is the result of any human activity or failure to observe "good agricultural or good manufacturing practices," such as the "addition of chemicals to irrigation water applied to soil or crops." Even where the chemical is a naturally occurring one, the regulations require that the producer, manufacturer, distributor, or holder of the food at all times utilize measures to reduce that chemical to the lowest level currently feasible.[2]

---

[1]The Agency engaged in a lengthy rulemaking process, the fairness of which has not been challenged by plaintiff. Thus, we do not include the entire procedural history of section 12501 here.

[2]The full text of the regulation is as follows:

"(a) Human consumption of a food shall not constitute an 'exposure' for purposes of Health and Safety Code section 25249.6 to a listed chemical in the food to the extent that the person responsible for the contact can show that the chemical is naturally occurring in the food.

"(1) For the purposes of this section, a chemical is 'naturally occurring' if it is a natural constituent of a food, or if it is present in a food solely as a result of absorption or accumulation of the chemical which is naturally present in the environment in which the food is raised, or grown, or obtained; for example, minerals present in the soil solely as a result of natural geologic processes, or toxins produced by the natural growth of fungi.

"(2) The 'naturally occurring' level of a chemical in a food may be established by determining the natural background level of the chemical in the area in which the food is raised, or grown, or obtained, based on reliable local or regional data.

"(3) A chemical is naturally occurring only to the extent that the chemical did not result from any known human activity. Where a food contains a chemical, in part naturally occurring and in part added as a result of known human activity, 'exposure' can only occur as to that portion of the chemical which resulted from such human activity. For purposes of this section, 'human activity' does not include sowing, planting, irrigation, or plowing or other mechanical preparation of soil for agricultural purposes; but does include the addition of chemicals to irrigation water applied to soil or crops.

"(4) Where a chemical contaminant can occur naturally in a food, the chemical is naturally occurring only to the extent that it was not avoidable by good agricultural or good manufacturing practices. The producer, manufacturer, distributor, or holder of the food shall at all times utilize quality control measures that reduce natural chemical contaminants to the

Following the adoption of section 12501, plaintiff filed, on October 6, 1989, a first amended complaint for declaratory and injunctive relief against the Governor of the State of California, the Secretary of the Agency, and his Deputy Secretary (defendants), seeking a determination that the regulation is unlawful. Plaintiff contends that Proposition 65 created no categorical exemption for naturally occurring carcinogens or naturally occurring reproductive toxins, which are as threatening to health as man-made toxins. Plaintiff maintains that there is no scientific basis for distinguishing between man-made and naturally occurring substances, and that Proposition 65 did not sanction such distinctions.

Defendants answered the amended complaint on December 5, 1989, after unsuccessfully demurring. On May 9, 1990, defendants moved for summary judgment on plaintiff's complaint contending that there was no genuine issue of material fact, and that section 12501 was lawful and reasonably necessary to effectuate the statutory purpose of Health and Safety Code section 25249.5 et seq. Defendants' motion was accompanied by a separate statement of uncontested material facts which set forth the entire procedural history of section 12501. Plaintiff brought a cross-motion for summary judgment on June 11, 1990, in which plaintiff conceded that no genuine issue existed with respect to any of the facts set forth in defendants' separate statement of uncontested material fact.

The only issue contested in the court below was whether section 12501 was in conflict with Health and Safety Code section 25249.5 et seq., or was not reasonably necessary to effectuate the statutory purpose of those sections. Following a hearing on July 10, 1990, defendants' motion was granted and plaintiff's motion was denied. Judgment was entered against plaintiff and in favor of defendant on September 17, 1990. Plaintiff's timely appeal followed.

## DISCUSSION

*Standard of Review*

The sole issue on appeal is whether section 12501 is in conflict with or is not reasonably necessary to effectuate the statutory purpose of Health and

---

'lowest level currently feasible,' as this term is used in the Code of Federal Regulations, title 21, section 110.110, subdivision (c) (1988).

"(b) A person otherwise responsible for an exposure to a listed chemical in a consumer product, other than food, does not 'expose' an individual within the meaning of section 25249.6, to the extent that the person can show that the chemical was a naturally occurring chemical in food, and the food was used in the manufacture, production, or processing of the consumer product. Where a consumer product contains a listed chemical, and the source of the chemical is in part from a naturally occurring chemical in food and in part from other sources, 'exposure' can only occur as to that portion of the chemical from other sources."

Safety Code section 25249.5 et seq. Our task is to determine whether the Agency "reasonably interpreted its legislative mandate" in adopting that regulation. (*Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal. Rptr. 484, 620 P.2d 1032], citing *Credit Ins. Gen. Assn.* v. *Payne* (1976) 16 Cal.3d 651, 657 [128 Cal.Rptr. 881, 547 P.2d 993].) ■ "Where a statute empowers an administrative agency to adopt regulations, such regulations 'must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose.' " (*Woods, supra*, citing *Mooney* v. *Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231].) We defer, to some extent, to the technical skill and expertise of the rulemaking agency in interpreting the statutes at issue. On the other hand, there is no agency discretion to promulgate a regulation which is inconsistent with the governing statute. (*Woods, supra*, at p. 679.) " 'Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to [,] strike down such regulations [citing *Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 (63 Cal.Rptr. 689, 433 P.2d 697)].' " (*Ibid.*)

*Is the Regulation in Conflict With the Governing Statutes?*

■ We find that the regulation is not in conflict with the statute. Section 12501 was adopted by the Agency in order to interpret the terms "expose" and "exposure" as they are used in section 25249.6 of the Health and Safety Code. These terms are not specifically defined in the statute. In its final statement of reasons, the Agency stated:

"The Agency has determined that the adoption of these regulations is necessary in order to implement the warning requirement of the Act in a reasonable manner and to facilitate compliance with the Act by defining key terms and making them more specific and relevant to the regulated business activities. The regulations in Article 5 define specific conditions where exposure to a listed chemical will not be deemed an 'exposure' for purposes of the warning requirement."

Plaintiff contends that the Agency regulation is in conflict with the statute, because the statute regulates all chemicals which are known to the state to cause cancer or reproductive toxicity and makes no exception for naturally occurring chemicals. Defendants contend, on the other hand, that while it is true that the statute purports to regulate all listed chemicals, warnings are required only when a business "exposes" an individual to a listed chemical. The term "exposes" is not defined by the statute and, therefore, the defendants argue that the Agency may define the term in order to implement the statute and its purposes.

Our determination rests on whether the Agency's definition of exposure conflicts with the statute or its purposes. Proposition 65, and the corresponding sections of the Health and Safety Code, are silent on the subject of naturally occurring carcinogens and reproductive toxins. We must search then, for whatever more subtle expressions of the electorate's intent may exist in the language of the statute, as well as the ballot arguments both for and against the proposition. Those sources indicate that Proposition 65 sought to regulate toxic substances which are deliberately added or put into the environment by human activity. The controlling language of the Proposition, now Health and Safety Code section 25249.6, provides that "no person in the course of doing business shall *knowingly and intentionally expose* any individual" (italics added), thereby suggesting that some degree of human activity which results in toxins being added to the environment is required.

Of course, one could argue that furnishing foods to consumers which are known to contain naturally occurring carcinogens or reproductive toxins might constitute a "knowing and intentional" exposure of individuals to the chemicals. However, the ballot argument in favor of Proposition 65 explains that "[Proposition 65] will not take anyone by surprise. [It] applies only to businesses that *know* they are putting one of the chemicals out into the environment . . . ." (Italics in original.) A chemical is not "put" into the environment if it is naturally occurring in, for example, fruits and vegetables.

The ballot argument against Proposition 65 also includes strong language indicating that naturally occurring substances are not intended to be controlled by the proposed statute: "The simple scientific fact of the matter is that manmade carcinogens represent only a tiny fraction of the total carcinogens we are exposed to, most of which are natural substances such as tobacco, alcohol, and chemicals in green plants. Significant amounts of manmade carcinogens are highly regulated in California under the most stringent laws in the United States. This initiative will result in chasing after trivial amounts of manmade carcinogens at *enormous cost* with minimal benefit to our health." (Italics in original.)

To be sure, one could find some support for plaintiff's position that no exemption for naturally occurring chemicals was intended, based on the absence of such distinctions in both the general language of the proposition and in the specific definition of the substances proposed to be controlled. The ballot proposition itself stated, by way of introduction, that: "[t]he people of California find that hazardous chemicals pose a serious threat to their health and well-being, that state government agencies have failed to provide them with adequate protection and that these failures have been

serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs. The people therefore declare their rights: . . . (b) To be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm." Similarly, the list of chemicals to be controlled is defined in the proposition as "those chemicals known to the state to cause cancer or reproductive toxicity" and makes no distinction between man-made and naturally occurring substances.

Thus, although some language may be found in the proposition and ballot arguments which both supports and refutes plaintiff's position that naturally occurring toxins are subject to the initiative statute, we are persuaded, on balance, that the better view is that the electorate did not intend naturally occurring substances to be controlled by Proposition 65. Use of terms such as "knowingly and intentionally" and "putting" implies that human conduct which results in toxins being *added* to the environment is the activity to be controlled. The opponents of the initiative expressly indicated that only "man-made" substances would be regulated. We find that section 12501 is consistent with the governing statutes.[3]

*Does the Regulation Reasonably Effectuate the Statutory Purpose?*

■  We also find that substantial evidence was presented that the regulation reasonably effectuates the statutory purpose. (Gov. Code, § 11350, subd. (b).) Evidence was presented at the public hearings on this regulation, and was made part of the original petition for the proposed regulation, that most food products contain at least trace amounts of carcinogens and reproductive toxins which appear on the Governor's list. The administrative record also includes commentary regarding the paucity of scientific data regarding the risks posed by exposure to such naturally occurring substances.

We all presume, to some extent, that foods that have been eaten for thousands of years are healthful, despite the presence of small amounts of naturally occurring toxins. Were these substances not exempted from Health and Safety Code section 25249.6's warning requirements, the manufacturer

---

[3]Proposition 65 also created exemptions from the warning requirement for exposures "for which the person responsible can show that the exposure poses no significant risk assuming lifetime exposure at the level in question for substances known to the state to cause cancer, and that the exposure will have no observable effect assuming exposure at one thousand (1000) times the level in question for substances known to the state to cause reproductive toxicity, based on evidence and standards which form the scientific basis for the listing of such chemical pursuant to subdivision (a) of Section 25249.8." Since the proposition plainly provided for a categorical exemption for exposures which pose no "significant risk," it would not be inconsistent for the Agency to enact regulations defining more specifically those exposures which pose an *insignificant* risk to individuals.

or seller of such products would bear the burden of proving, under subdivision (c) of Health and Safety Code section 25249.10, that the exposure poses no "significant risk" to individuals. The administrative record in this matter indicates that such evidence largely does not exist. Thus, grocers and others would be required, in order to avoid liability under these statutes, to post a warning label on most, if not all, food products. The Agency's final statement of reasons for section 12501 includes the observation that the "[a]bsence of such an exemption could unnecessarily reduce the availability of certain foods or could lead to unnecessary warnings, which could distract the public from other important warnings on consumer products." Since one of the principal purposes of the statutes in question is to provide "clear and reasonable warning" of exposure to carcinogens and reproductive toxins, such warnings would be diluted to the point of meaninglessness if they were to be found on most or all food products.

The final statement of reasons also provides that the rationale for this special treatment for foodstuffs is the historical desire to preserve naturally occurring foods in the American food supply, despite the presence in those foods of small amounts of potentially deleterious substances, as well as to recognize the general safety of unprocessed foods as a matter of consumer experience. This exemption, therefore, will further the statutory purpose in safeguarding the effectiveness of warnings which are given, and in removing from regulatory scrutiny those substances which pose only an "insignificant risk" of cancer or birth defects, within the meaning of the statute.

The regulation is also narrowly drawn. It is applicable only to naturally occurring chemicals in foodstuffs and not other products, such as pharmaceuticals and cosmetics. It takes pains to define "naturally occurring" in such a fashion so as to preclude chemicals which are in whole or in part the product of human activity. Thus, a chemical is "naturally occurring" only if it is a natural constituent of food or if it is present solely as a result of the absorption or accumulation of chemicals which are naturally present in the environment. Even if a chemical occurs naturally in a food, it is not deemed to be "naturally occurring," under the regulation, to the extent it is avoidable by good agricultural or manufacturing techniques. Natural chemical contaminants must be reduced to the "lowest level currently feasible."

## CONCLUSION

We hold that the actions of the Agency in promulgating section 12501 were not arbitrary or capricious, or lacking in evidentiary support, and that the Agency considered all relevant factors. We further hold that the regulation is the product of the Agency's rational analysis of those factors, and that it is not in conflict with and reasonably promotes the statutory purposes of

Proposition 65. (*California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d. 200, 211-212 [157 Cal.Rptr. 840, 599 P.2d 31].)

DISPOSITION

The judgment is affirmed.

Turner, P. J., and Boren, J., concurred.

Petitions for a rehearing were denied June 13, 1991.