Filed 4/8/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ASSOCIATION OF CALIFORNIA INSURANCE COMPANIES et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> DAVE JONES, as Commissioner, etc., <br><br> Defendant and Appellant. | B248622 <br><br> (Los Angeles County Super. Ct. No. BC463124) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory Wilson Alarcon, Judge. Affirmed.

Kamala D. Harris, Attorney General, Paul D. Gifford, Senior Assistant Attorney General, W. Dean Freeman, Supervising Deputy Attorney General, and Lisa W. Chao, Deputy Attorney General, for Defendant and Appellant.

Amy Bach, Daniel Wade; Kerr & Wagstaffe and Ivo Michael Labar for United Policyholders, Scripps Ranch Civic Association and Rancho Bernardo Community Counsel as Amici Curiae on behalf of Defendant and Appellant.

Greenberg Traurig, Gene Gordon Livingston, Gregory Sperla and Stephen E. Paffrath for Plaintiffs and Respondents.

This appeal asks us to decide whether the Insurance Commissioner (Commissioner) had authority to promulgate California Code of Regulations, title 10, section 2695.183 (the Regulation) under the authority delegated to him by the Unfair Insurance Practices Act (UIPA), Insurance Code sections 790–790.15.[1]  The trial court found that he did not.  We agree and affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

**The Regulation**

The Regulation at issue here involves homeowner insurance, and specifically replacement coverage in the event of a covered event like a fire.[2]  In general, there are

---

[1] Undesignated statutory references are to the Insurance Code.

[2] The Regulation provides:  "No licensee shall communicate an estimate of replacement cost to an applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis, unless the requirements and standards set forth in subdivisions (a) through (e) below are met:

"(a) The estimate of replacement cost shall include the expenses that would reasonably be incurred to rebuild the insured structure(s) in its entirety, including at least the following:

"(1) Cost of labor, building materials and supplies;

"(2) Overhead and profit;

"(3) Cost of demolition and debris removal;

"(4) Cost of permits and architect's plans; and

"(5) Consideration of components and features of the insured structure, including at least the following:

"(A) Type of foundation;

"(B) Type of frame;

"(C) Roofing materials and type of roof;

"(D) Siding materials and type of siding;

"(E) Whether the structure is located on a slope;

"(F) The square footage of the living space;

"(G) Geographic location of property;

"(H) Number of stories and any nonstandard wall heights;

"(I) Materials used in, and generic types of, interior features and finishes, such as, where applicable, the type of heating and air conditioning system, walls, flooring, ceiling, fireplaces, kitchen, and bath(s);

"(J) Age of the structure or the year it was built; and

"(K) Size and type of attached garage.

"(b) The estimate of replacement cost shall be based on an estimate of the cost to rebuild or replace the structure taking into account the cost to reconstruct the single property being evaluated, as compared to the cost to build multiple, or tract, dwellings.

"(c) The estimate of replacement cost shall not be based upon the resale value of the land, or upon the amount or outstanding balance of any loan.

"(d) The estimate of replacement cost shall not include a deduction for physical depreciation.

"(e) The licensee shall no less frequently than annually take reasonable steps to verify that the sources and methods used to generate the estimate of replacement cost are kept current to reflect changes in the costs of reconstruction and rebuilding, including changes in labor, building materials, and supplies, based upon the geographic location of the insured structure.  The estimate of replacement cost shall be created using such reasonably current sources and methods.

"(f) Except as provided in subdivision (k) of this Section 2695.183, the provisions of this article are binding upon licensees, notwithstanding the fact that information, data or statistical methods used or relied upon by a licensee to estimate replacement cost may be obtained through a third party source.  Any and all information received by the Department pursuant to this article shall be accorded the degree of confidential treatment required by section 735.5 of the Insurance Code or Chapter 2 of Part 1 of Division 3 of Title 2 of the Government Code, commencing at section 11180.

"(g)(1) If a licensee communicates an estimate of replacement cost to an applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis, the licensee must provide a copy of the estimate of replacement cost to the applicant or insured at the time the estimate is communicated.  However, in the event the estimate of replacement cost is communicated by a licensee to an applicant to whom the licensee determines an insurance policy shall not be issued, then the licensee is not required pursuant to the preceding sentence to provide a copy of the estimate of replacement cost.  In the event the estimate of replacement cost is communicated by telephone to an insured, the copy of the estimate shall be mailed to the insured no later than three business days after the time of the telephone conversation.  In the event the estimate of replacement cost is communicated by telephone to an applicant, the copy of the estimate shall be mailed to the applicant no later than three business days after the applicant agrees to purchase the coverage.

"(2) An estimate of replacement cost provided in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a

3

replacement cost basis must itemize the projected cost for each element specified in paragraphs (a)(1) through (a)(4), and shall identify the assumptions made for each of the components and features listed in paragraph (a)(5), of this Section 2695.183.

"(h) If an estimate of replacement cost is updated or revised by, or on behalf of, the licensee and the revised estimate of replacement cost is communicated to the applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis, the licensee shall provide a copy of the revised or updated estimate of replacement cost to the applicant as provided in paragraph (g)(1) of this Section 2695.183, or to the insured simultaneously with the renewal offer, as the case may be. This subdivision (h) shall not apply when the update or revision to the estimate of replacement cost or the policy limit results solely from the application of an inflationary provision in a policy or an inflation factor. This subdivision (h) shall not obligate a licensee to recalculate an estimate of replacement cost on an annual basis.

"(i) Licensees shall maintain (1) a record of the information supplied by the applicant or insured that is used by the licensee to generate the estimate of replacement cost, and (2) a copy of any estimate of replacement cost supplied to the applicant or insured pursuant to paragraph (g)(1), or subdivision (h), of this Section 2695.183. If a policy is issued, these records and copies shall be maintained for the entire term of the insurance policy or the duration of coverage, whichever terminates later in time, and for five years thereafter. However, if the estimate of replacement cost is provided to an applicant to whom an insurance policy is never issued, the records and copies referred to in the first sentence of this subdivision (i) shall be maintained for the period of time the licensee ordinarily maintains applicant files in the normal course of business, provided that such period of time shall be at least sufficient to ensure that the licensee is able to comply with the provisions of this subdivision in the event the policy is issued to the applicant.

"(j) To communicate an estimate of replacement value not comporting with subdivisions (a) through (e) of this Section 2695.183 to an applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis constitutes making a statement with respect to the business of insurance which is misleading and which by the exercise of reasonable care should be known to be misleading, pursuant to Insurance Code section 790.03.

"(k) When an insurer identifies one or more specific sources or tools that a broker-agent must use to create an estimate of replacement cost,

"(1) the insurer shall prescribe complete written procedures to be followed by broker-agents when they use the sources or tools,

"(2) the insurer shall provide the broker-agent with the training and written training materials necessary to properly utilize the sources or tools according to the insurer's prescribed procedures, and

"(3) the insurer, and not the broker-agent, shall be responsible for any noncompliance with this Section 2695.183 that results from the failure of the estimate to satisfy the requirements of subdivisions (a) through (e), unless that noncompliance results from failure by the broker-agent to follow the insurer's prescribed written procedures when using the source or tool.

"(*l*) This Section 2695.183 applies to all communications by a licensee, verbal or written, with the sole exception of internal communications within an insurer, or confidential communications between an insurer and its contractor, that concern the insurer's underwriting decisions and that never come to the attention of an applicant or insured.

"(m) No provision of this article shall be construed as requiring a licensee to estimate replacement cost or to set or recommend a policy limit to an applicant or insured. No provision of this article shall be construed as requiring a licensee to advise the applicant or insured as to the sufficiency of an estimate of replacement cost.

"(n) No provision of this article shall limit or preclude a licensee from providing and explaining the California Residential Property Insurance Disclosure, as cited in Insurance Code section 10102, explaining the various forms of replacement cost coverage available to an applicant or insured, or explaining how replacement cost basis policies operate to pay claims.

"(o) No provision of this article shall limit or preclude an applicant or insured from obtaining his or her own estimate of replacement cost from an entity permitted to make such an estimate by Insurance Code section 1749.85.

"(p) For purposes of this subdivision (p), 'minimum amount of insurance' shall mean the lowest amount of insurance that an insurer requires to be purchased in order for the insurer to underwrite the coverage on a particular property, based upon an insurer's eligibility guidelines, underwriting practices and/or actuarial analysis. An insurer may communicate to an applicant or insured that an applicant or insured must purchase a minimum amount of insurance that does not comport with subdivisions (a) through (e) of this Section 2695.183; however, if the minimum amount of insurance that is communicated is based in whole or in part on an estimate of replacement value, the estimate of replacement value shall also be provided to the applicant or insured and shall comply with all applicable provisions of this article. Nothing in this article shall limit or preclude an insurer from agreeing to provide coverage for a policy limit that is greater than or less than an estimate of replacement cost provided pursuant to this article.

"(q) This article shall apply only to estimates of replacement value that are prepared, communicated or used by a licensee on or after June 27, 2011."

5

three kinds of replacement cost coverage. Each requires an insurer to pay replacement costs up to a limit defined in the policy or up to a set amount above the policy limit.[3] If the cost of repairing or rebuilding a home damaged or destroyed by a covered event exceeds that limit, the homeowner has to pay the difference. Section 2051.5, subdivision (a) defines replacement cost, in pertinent part, as "the amount that it would cost the insured to repair, rebuild, or replace the thing lost or injured, without a deduction for physical depreciation, or the policy limit, whichever is less."

The Regulation was promulgated in 2010 in response to complaints received from homeowners who lost their residences in the wildfires in Southern California in 2003, 2007, and 2008. These complaints arose when homeowners learned that they did not have enough insurance to cover the full cost of repairing or rebuilding their homes because when they bought their homeowner insurance, the estimates of replacement value were too low.[4]

The introductory sentence of the Regulation prohibits a "licensee" from "communicat[ing] an estimate of replacement cost to an applicant or insured in connection with an application for renewal of a homeowners' insurance policy that

---

[3] According to the Commissioner's "Initial Statement of Reasons," dated April 2, 2010, issued when the Commissioner proposed the Regulation, there is "Limited Replacement Cost Coverage With an Additional Percentage which pays replacement costs up to a specified amount above the policy limit; [¶] Limited Replacement Cost Coverage With No Additional Percentage which pays replacement costs up to" the dollar limit set forth in the policy; and "Actual Cash Value Coverage which pays the fair market value of the dwelling at the time of the loss, or the cost to repair, rebuild, or replace the damaged or destroyed dwelling with like kind and quality construction up to the policy limit."

[4] The administrative record contains complaints about, among other things, the estimator's using an incorrect description of the property or its square footage, failing to inspect the property, not considering building code requirements, not including obvious costs like debris removal, and not adjusting for inflation in arriving at a replacement cost estimate. It also included a survey conducted after the 2007 wildfires reciting that 75 percent of those responding to the survey complained that their insurance limits did not cover the cost of rebuilding their structures.

provides coverage on a replacement cost basis" that does not satisfy the content and format provisions in the Regulation. Subdivision (a) of the Regulation states, among other requirements, that an estimate of replacement cost "shall include expenses that would reasonably be incurred to rebuild the insured structure(s) in its entirety" and requires in subdivision (a)(1)–(4) that the estimate include the cost of labor, building materials and supplies, overhead, profit, demolition, debris removal, permits, and architect's plans, and in subdivision (a)(5) that the licensee "consider" 11 designated "components and features of the insured structure."

The estimate must itemize "the projected cost" of each expense listed in subdivision (a)(1)–(4), and the assumptions as to the components listed in subdivision (a)(5). (Reg., subd. (g)(2).) A copy of the estimate and any update of the estimate "must" be given to the applicant. (Reg., subds. (g)(1), (h).) Subdivision (e) requires that "reasonable steps" be taken to "verify . . . sources and methods used to generate the estimate of replacement cost" "no less frequently than annually." The Regulation also imposes recordkeeping obligations on the licensee. (Reg., subd. (i).)

Of particular significance to the issue before us is subdivision (j) of the Regulation. It provides that "communicat[ing] an estimate of replacement value not comporting with divisions (a) through (e)" to an applicant for homeowner insurance "provid[ing] coverage on a replacement cost basis," or any renewal thereof, "constitutes making a statement with respect to the business of insurance which is misleading and which by the exercise of reasonable care should be known to be misleading, pursuant to Insurance Code section 790.03."

Representatives from the plaintiffs, the Association of California Insurance Companies and the Personal Insurance Federation of California (Associations), submitted comments and testified in the May 17, 2010 "homeowners insurance hearing," which preceded promulgation of the Regulation. During that hearing, they stated that the Commissioner lacked authority to define new unfair business practices. They questioned whether the administrative record supported the Commissioner's assertion that there was

7

a high volume of homeowner complaints "specifically about the fact that that they were not provided certain information that they needed to make an informed decision about what insurance coverage limitation they have," or that the "underinsured problem" was caused by lack of knowledge. Among other comments, they decried the expense of compliance with the Regulation and predicted that the Regulation would discourage carriers from providing insurance.

**The declaratory relief proceedings**

On June 8, 2011, the Associations filed a declaratory relief action. There, they sought a declaration that the Regulation was invalid because the Commissioner lacked authority to "regulate the underwriting of homeowner insurance"; section 790.03 did not authorize "the imposition of a single, detailed method for estimating the replacement cost of houses"; and the Regulation violated insurance companies' free speech rights under the First Amendment of the United States Constitution.

After the Associations' motion for judgment on the pleadings was denied, the parties agreed that the case could be tried based on the rulemaking file, written briefs, and oral argument without oral testimony. Trial and oral argument were held on February 4, 2013.

**The Associations' arguments**

In their trial brief, the Associations argued that in response to comments at the administrative hearing about the Commissioner's lack of authority to promulgate the Regulation, the Commissioner cited section 790.10 of the UIPA and section 1749.85, but that neither provided any such authority. In essence, they argued that the Commissioner's reliance on section 790.10 ignored the language and structure of the UIPA, which at trial they characterized as "unique," particularly its use of the terms "defined" and "determined." Section 1749.85 merely authorized promulgating standards for calculating replacement cost estimates prepared by appraisers.

Section 790.10 provides: "The commissioner shall, from time to time as conditions warrant, after notice and public hearing, promulgate reasonable rules and

8

regulations, and amendments and additions thereto, as are necessary to administer this article." The Associations conceded that section 790.10 gave authority to the Commissioner to "administer" the UIPA, but argued that it did not give him authority to define unfair business practices.

More specifically, section 790 of the UIPA provides: "The purpose of this article is to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the Act of Congress of March 9, 1945 (Public Law 15, Seventy-ninth Congress), by *defining, or providing for the determination* of, all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so *defined* or *determined*." (Italics added.)

The Associations argued that the Legislature defined "unfair and deceptive acts or practices in the business of insurance" in section 790.03,[5] which states that "[t]he

---

[5] The full text of section 790.03 is as follows: "The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance.

"(a) Making, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular, or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby or the dividends or share of the surplus to be received thereon, or making any false or misleading statement as to the dividends or share of surplus previously paid on similar policies, or making any misleading representation or any misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates, or using any name or title of any policy or class of policies misrepresenting the true nature thereof, or making any misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce the policyholder to lapse, forfeit, or surrender his or her insurance.

"(b) Making or disseminating or causing to be made or disseminated before the public in this state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatsoever, any statement containing any assertion, representation, or statement with respect to the business of insurance or with respect to any person in the conduct of his or her insurance business, which is untrue, deceptive, or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue, deceptive, or misleading.

"(c) Entering into any agreement to commit, or by any concerted action committing, any act of boycott, coercion, or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance.

"(d) Filing with any supervisory or other public official, or making, publishing, disseminating, circulating, or delivering to any person, or placing before the public, or causing directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public any false statement of financial condition of an insurer with intent to deceive.

"(e) Making any false entry in any book, report, or statement of any insurer with intent to deceive any agent or examiner lawfully appointed to examine into its condition or into any of its affairs, or any public official to whom the insurer is required by law to report, or who has authority by law to examine into its condition or into any of its affairs, or, with like intent, willfully omitting to make a true entry of any material fact pertaining to the business of the insurer in any book, report, or statement of the insurer.

"(f)(1) Making or permitting any unfair discrimination between individuals of the same class and equal expectation of life in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contract.

"(2) This subdivision shall be interpreted, for any contract of ordinary life insurance or individual life annuity applied for and issued on or after January 1, 1981, to require differentials based upon the sex of the individual insured or annuitant in the rates or dividends or benefits, or any combination thereof. This requirement is satisfied if those differentials are substantially supported by valid pertinent data segregated by sex, including, but not limited to, mortality data segregated by sex.

"(3) However, for any contract of ordinary life insurance or individual life annuity applied for and issued on or after January 1, 1981, but before the compliance date, in lieu of those differentials based on data segregated by sex, rates, or dividends or benefits, or any combination thereof, for ordinary life insurance or individual life annuity on a female life may be calculated as follows: (A) according to an age not less than three years nor more than six years younger than the actual age of the female insured or female annuitant, in the case of a contract of ordinary life insurance with a face value greater than five thousand dollars ($5,000) or a contract of individual life annuity; and (B) according to an age not more than six years younger than the actual age of the female insured, in the case of a contract of ordinary life insurance with a face value of five thousand dollars ($5,000) or less. 'Compliance date' as used in this paragraph shall mean the date or dates established as the operative date or dates by future amendments to this code directing and authorizing life insurers to use a mortality table containing mortality data segregated by sex for the calculation of adjusted premiums and present values for nonforfeiture benefits and valuation reserves as specified in Sections 10163.1 and 10489.2 or successor sections.

"(4) Notwithstanding the provisions of this subdivision, sex-based differentials in rates or dividends or benefits, or any combination thereof, shall not be required for (A) any contract of life insurance or life annuity issued pursuant to arrangements which may be considered terms, conditions, or privileges of employment as these terms are used in Title VII of the Civil Rights Act of 1964 (Public Law 88-352), as amended, and (B) tax sheltered annuities for employees of public schools or of tax-exempt organizations described in Section 501(c)(3) of the Internal Revenue Code.

"(g) Making or disseminating, or causing to be made or disseminated, before the public in this state, in any newspaper or other publication, or any other advertising device, or by public outcry or proclamation, or in any other manner or means whatever, whether directly or by implication, any statement that a named insurer, or named insurers, are members of the California Insurance Guarantee Association, or insured against insolvency as defined in Section 119.5. This subdivision shall not be interpreted to prohibit any activity of the California Insurance Guarantee Association or the commissioner authorized, directly or by implication, by Article 14.2 (commencing with Section 1063).

"(h) Knowingly committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices:

"(1) Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.

"(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

"(3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.

"(4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured.

"(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

"(6) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered.

"(7) Attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he or she was entitled by reference to written or printed advertising material accompanying or made part of an application.

"(8) Attempting to settle claims on the basis of an application that was altered without notice to, or knowledge or consent of, the insured, his or her representative, agent, or broker.

"(9) Failing, after payment of a claim, to inform insureds or beneficiaries, upon request by them, of the coverage under which payment has been made.

11

following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance." Included in the conduct and acts so defined is subdivision (b), which provides: "Making or disseminating or causing to be made or disseminated before the public in this state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatsoever, any statement containing any assertion, representation, or statement with respect to the business of insurance or with respect to any person in the conduct of his or her insurance business, which is untrue, deceptive, or

---

"(10) Making known to insureds or claimants a practice of the insurer of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration.

"(11) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information.

"(12) Failing to settle claims promptly, where liability has become apparent, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.

"(13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement.

"(14) Directly advising a claimant not to obtain the services of an attorney.

"(15) Misleading a claimant as to the applicable statute of limitations.

"(16) Delaying the payment or provision of hospital, medical, or surgical benefits for services provided with respect to acquired immune deficiency syndrome or AIDS-related complex for more than 60 days after the insurer has received a claim for those benefits, where the delay in claim payment is for the purpose of investigating whether the condition preexisted the coverage. However, this 60-day period shall not include any time during which the insurer is awaiting a response for relevant medical information from a health care provider.

"(i) Canceling or refusing to renew a policy in violation of Section 676.10.

"(j) Holding oneself out as representing, constituting, or otherwise providing services on behalf of the California Health Benefit Exchange established pursuant to Section 100500 of the Government Code without a valid agreement with the California Health Benefit Exchange to engage in those activities."

misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue, deceptive, or misleading."

Section 790.06, subdivision (a) states, in pertinent part: "Whenever the commissioner shall have reason to believe that any person engaged in the business of insurance is engaging in this state in any method of competition or in any act or practice in the conduct of the business *that is not defined in Section 790.03*, and that the method is unfair or that the act or practice is unfair or deceptive and that a proceeding by him or her in respect thereto would be in the interest of the public, he or she may issue and serve upon that person an order to show cause containing a statement of the methods, acts or practices alleged to be unfair or deceptive . . . for the purpose of *determining* whether the alleged methods, acts or practices or any of them should be declared to be unfair or deceptive within the meaning of this article." (Italics added.)[6]

---

[6] The full text of section 790.06 is as follows: "(a) Whenever the commissioner shall have reason to believe that any person engaged in the business of insurance is engaging in this state in any method of competition or in any act or practice in the conduct of the business that is not defined in Section 790.03, and that the method is unfair or that the act or practice is unfair or deceptive and that a proceeding by him or her in respect thereto would be in the interest of the public, he or she may issue and serve upon that person an order to show cause containing a statement of the methods, acts or practices alleged to be unfair or deceptive and a notice of hearing thereon to be held at a time and place fixed therein, which shall not be less than 30 days after the service thereof, for the purpose of determining whether the alleged methods, acts or practices or any of them should be declared to be unfair or deceptive within the meaning of this article. The order shall specify the reason why the method of competition is alleged to be unfair or the act or practice is alleged to be unfair or deceptive.

"The hearings provided by this section shall be conducted in accordance with the Administrative Procedure Act (Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code), except that the hearings may be conducted by an administrative law judge in the administrative law bureau when the proceedings involve a common question of law or fact with another proceeding arising under other Insurance Code sections that may be conducted by administrative law bureau administrative law judges. The commissioner and the appointed administrative law judge shall have all the powers granted under the Administrative Procedure Act. If the alleged methods, acts, or practices or any of them are found to be unfair or deceptive within the

13

The Associations argued that the Regulation rendered replacement cost estimates not in compliance with the Regulation's content and format requirements "unfair and deceptive" notwithstanding that such conduct is not so "defined" in section 790.03 and that the Commissioner was required to, but did not follow the administrative and court procedures set forth in the UIPA in section 790.06 for "determining" whether that conduct should be declared "unfair and deceptive."[7]

---

meaning of this article the commissioner shall issue and service upon that person his or her written report so declaring.

"(b) If the report charges a violation of this article and if the method of competition, act or practice has not been discontinued, the commissioner may, through the Attorney General of this state, at any time after 30 days after the service of the report cause a petition to be filed in the superior court of this state within the county wherein the person resides or has his or her principal place of business, to enjoin and restrain the person from engaging in the method, act or practice. The court shall have jurisdiction of the proceeding and shall have power to make and enter appropriate orders in connection therewith and to issue any writs as are ancillary to its jurisdiction or are necessary in its judgment to prevent injury to the public pendente lite.

"(c) A transcript of the proceedings before the commissioner, including all evidence taken and the report and findings shall be filed with the petition. If either party shall apply to the court for leave to adduce additional evidence and shall show, to the satisfaction of the court, that the additional evidence is material and there were reasonable grounds for the failure to adduce the evidence in the proceeding before the commissioner, the court may order the additional evidence to be taken before the commissioner and to be adduced upon the hearing in the manner and upon the terms and conditions as to the court may seem proper. The commissioner may modify his or her findings of fact or make new findings by reason of the additional evidence so taken, and shall file modified or new findings with the return of the additional evidence.

"(d) If the court finds that the method of competition complained of is unfair or that the act or practice complained of is unfair or deceptive, that the proceeding by the commissioner with respect thereto is to the interest of the public and that the findings of the commissioner are supported by the weight of the evidence, it shall issue its order enjoining and restraining the continuance of the method of competition, act or practice."

[7] It was undisputed in the proceedings below that the Commissioner did not follow the procedures in section 790.06, which in addition to administrative processes, require a court order to enjoin conduct found to be unfair and deceptive.

14

Furthermore, the Regulation renders as unfair and deceptive estimates that are accurate, but not in the format dictated by the Regulation.  At the same time, the Regulation does not sanction an inaccurate estimate that complies with the format and content requirements of the Regulation.  The Associations cited as an admission the Commissioner's statement during an administrative hearing that "'[t]he regulations do not require of replacement value estimates any particular degree of accuracy.'"

The Associations also argued that that the Regulation "Unlawfully Restrict[ed] Underwriting" because despite the exemption for "internal communications within an insurer" in subdivision (*l*) of the Regulation, in practice, "communications about insurer's underwriting decisions do come to the attention of applicants and insureds, and particularly so with respect to adverse underwriting decisions."  Because "[t]he amount of homeowners' insurance is an essential part of the underwriting decision," the Regulation "unlawfully restricted homeowner insurers['] underwriting" and was therefore invalid.

Finally, the Associations argued that the Regulation was subject to the higher level of scrutiny imposed by *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557 [100 S.Ct. 2343] (*Central Hudson*) on government regulation of commercial speech under the First Amendment, and that the Regulation did not pass constitutional muster under the criteria set forth in *Central Hudson*.

**The Commissioner's arguments**

As discussed *post*, the Commissioner disavowed reliance on section 1749.85 as a source of authority to promulgate the Regulation except as to that portion of the Regulation regarding training of broker-agents.  Instead, his authority to promulgate the Regulation was grounded in section 790.10, and the UIPA must be construed broadly "to promote public welfare."  The Commissioner cited *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805 (*Calfarm*) and *Credit Ins. Gen. Agents Assn. v. Payne* (1976) 16 Cal.3d 651 (*Payne*) to support this proposition.  Citing *Batt v. City and County of San*

15

*Francisco* (2010) 184 Cal.App.4th 163, the Commissioner argued that his powers include elaborating on the meaning of key legislative terms.

Indeed, that "the promulgation of a regulation that defines a specific type of misleading statement is within the agency's rulemaking authority under a broad statutory prohibition against false and misleading statements" was recognized with respect to licensed automobile dealers in *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347 (*Ford Dealers*). Similarly, the Commissioner has authority to promulgate a regulation prohibiting a specific type of misleading statement from being communicated to purchasers of homeowners insurance. Therefore, it was a non sequitur for the Associations to argue that, just because estimates of replacement costs were not specifically identified in section 790.03, the Commissioner exceeded his authority in regulating them.

The Commissioner also argued that 790.06 was not a mechanism for adding new categories of unfair and deceptive insurance business practices. Instead, it is an enforcement tool to "enjoin a particular practice engaged by an individual insurer through procedures similar to an administrative disciplinary action."

The Commissioner also faulted the Associations for taking the Commissioner's statement regarding "accuracy" out of context because the statement was followed by a statement at the hearing that "all the regulations do [is] require that any estimate of replace[ment] cost be complete and must not ignore outright any of the basic cost components universally acknowledged to figure into replacement cost." The Commissioner further argued that accuracy was not required because "the Commissioner does not expect insurers to guarantee replacement cost."

The Regulation also does not regulate underwriting because it does not specify or otherwise dictate what risks insurance companies should underwrite and does not prevent an insurer from setting minimum or maximum amounts of coverage or any amount of coverage that is different from the estimate of replacement cost; in fact, subdivision (p) of the Regulation expressly so provides. Furthermore, the Regulation does not dictate how

16

the estimate is to be calculated; instead it requires that it be complete, based on current data, and communicated to the consumer.

In response to the Associations' free speech challenge to the Regulation, the Commissioner argued that restrictions on misleading commercial speech are evaluated under the "reasonably related" test in *Zauderer v. Office of Disciplinary Counsel* (1985) 471 U.S. 626 [105 S.Ct. 2265] (*Zauderer*) and not the intermediate scrutiny criteria set forth in *Central Hudson*, *supra*, 447 U.S. 557. Under either standard, however, he argued that the Regulation did not violate the Associations' free speech rights.

In their reply, the Associations largely repeated arguments from their opening brief. They also gave illustrations of how the Regulation expanded the definition of unfair and deceptive practices in section 790.03, subdivision (b). They hypothesized an estimate from a reputable contractor in a single figure to replace a home, including every detail down to the bathroom floor finishing, that was true, but that would be rendered "misleading" under the Regulation because it failed to itemize its components. The same would be true for an oral estimate because the Regulation requires the estimate to be in writing. In the Associations' own words, "Mandatory, specified communication is a far cry from prohibiting misleading statements."

**The trial court's statement of decision**

The trial court agreed with the Associations' contention that the Commissioner did not have authority to promulgate the Regulation. The court reasoned that estimates of replacement costs, although "inherently inaccurate," are not misleading. By characterizing all estimates of replacements costs as misleading except ones that complied with the content and format requirements in the Regulation, the Commissioner "expands the meaning of something 'known' or which 'should be known' to be misleading beyond the parameters of §790.03(b)." The court concluded that section 790.03, subdivision (b) did not give the Commissioner authority "to penalize acts not known or cannot be determined through reasonable care to be misleading."

The trial court also dismissed the Commissioner's legal authorities. Thus, the court concluded that *Calfarm*, *supra*, 48 Cal.3d 805, involved *dicta* regarding a void statutory scheme that required the "agency to fill in the blanks," and *Payne*, *supra*, 16 Cal.3d 651, expressly "caution[ed]" against issuing regulations that conflicted with the enabling statute. Because the Regulation renders conduct not described in section 790.03, subdivision (b) as misleading, the Commissioner was required to follow the procedures in section 790.06, which he had failed to do. Because the trial court found that the Regulation was unauthorized, it did not address the Associations' other arguments.

The judgment declaring the Regulation invalid was entered on May 7, 2013. On May 9, 2013, the Commissioner filed a notice of appeal.

## DISCUSSION

**Standard of review and the parties' additional arguments on appeal**

The parties do not contest that neither the trial court nor we are required to give deference to an administrative agency's interpretation of the scope of its own authority.[8] (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415 ["when an implementing regulation is challenged on the ground that it is 'in conflict with the statute' [citation] or does not 'lay within the lawmaking authority delegated by the Legislature' [citation], the issue of statutory construction is a question of law on which a court exercises independent judgment"]; *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 271 ["That is to say, whether Proposition 103 authorizes the Insurance Commissioner to adopt rate regulations to implement the initiative is indeed examined independently."]; *Batt v. City and County of San Francisco*, *supra*, 184 Cal.App.4th at p. 170 ["Such an inquiry obviously requires examination of the statute and the regulation(s), and that examination would be de novo because it entails what we have called, 'the quintessential judicial function.'"].)

---

[8] At trial, the Associations disclaimed any attack on the Regulation on the basis of lack of necessity.

18

On appeal, the parties generally make the same arguments that they made before the trial court. We will not repeat those here. We summarize only the new matters.

Both the Commissioner and the *amici curiae*[9] contend that the trial court "conflated" the terms "accurate" and "misleading" because the focus of the Regulation is completeness and not exactness. The Regulation addresses the problem that arises when a replacement cost estimate does not include all reasonable components necessary to rebuild a home. If a consumer relies on such an estimate in selecting a policy limit, the consumer risks being underinsured. The fact that estimates are not always accurate does not negate the need for an insurer to communicate a complete estimate. Accordingly, the Commissioner argues that, just because an estimate is not always accurate, does not mean it cannot be misleading. In support of this position, he cites *Ford Dealers*, *supra*, 32 Cal.3d 347.

The Commissioner faulted the trial judge for making section 790.06 a substitute for rulemaking processes. Instead, section 790.06 is an enforcement tool against an individual insurer and not an across-the-board regulation of the insurance industry. The trial judge also ignored section 790.05.[10] Irrespective of the existence of the Regulation,

---

[9] The United Policyholders, Scripps Ranch Civic Association, and Rancho Bernardo Community Council filed an *amici* brief in support of the Commissioner.

[10] Section 790.05 provides: "Whenever the commissioner shall have reason to believe that a person has been engaged or is engaging in this state in any unfair method of competition or any unfair or deceptive act or practice defined in Section 790.03, and that a proceeding by the commissioner in respect thereto would be to the interest of the public, he or she shall issue and serve upon that person an order to show cause containing a statement of the charges in that respect, a statement of that person's potential liability under Section 790.035, and a notice of a hearing thereon to be held at a time and place fixed therein, which shall not be less than 30 days after the service thereof, for the purpose of determining whether the commissioner should issue an order to that person to, pay the penalty imposed by Section 790.035, and to cease and desist those methods, acts, or practices or any of them.

"If the charges or any of them are found to be justified the commissioner shall issue and cause to be served upon that person an order requiring that person to pay the

section 790.05 sets forth the procedures before an administrative law judge for bringing a noncompliance proceeding against a licensee alleged to have engaged in an unfair and deceptive practice prohibited by section 790.03, including "misleading" statements under section 790.03, subdivision (b).

The Associations supported the trial court's reasoning. They reiterated that the UIPA is unique, and for that reason *Calfarm*, *Payne*, and *Ford Dealers* are not instructive because they involved either a different kind of insurance, administrative proceeding, or statute.

In addition, the Associations argued the legislative history of section 790.10, when it was added in 1971 to the UIPA, indicates that the Legislature did not intend that section 790.10 be a vehicle for the Commissioner to regulate insurance practices under cover of disseminating misleading statements under section 790.03, subdivision (b). As originally drafted, section 790.10 would have used the word "implement," a broader grant of power according to the Associations; instead, the Legislature used the narrower term "administer," as the statute currently reads. (Stats. 1971, ch. 975, § 1, p. 1887.)[11] The Associations contend that this was confirmed when the Legislature amended section

_____

penalty imposed by Section 790.035 and to cease and desist from engaging in those methods, acts, or practices found to be unfair or deceptive.

"The hearing shall be conducted in accordance with the Administrative Procedure Act, Chapter 5 (commencing at Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code, except that the hearings may be conducted by an administrative law judge in the administrative law bureau when the proceedings involve a common question of law or fact with another proceeding arising under other Insurance Code sections that may be conducted by administrative law bureau administrative law judges. The commissioner and the appointed administrative law judge shall have all the powers granted under the Administrative Procedure Act.

"The person shall be entitled to have the proceedings and the order reviewed by means of any remedy provided by Section 12940 of this code or by the Administrative Procedure Act."

[11] A copy of Assembly Bill No. 1353 (1971 Reg. Sess.) as amended July 9, 1971, is attached as exhibit B to the Associations' request for judicial notice filed on April 7, 2014, which request we granted on February 20, 2015.

790.06 in 2000 to "address[] the authority of the Insurance Commissioner when the Commissioner has reason to believe an unfair or deceptive practice has occurred that is not one specifically defined in Insurance Code Section 790.03" by requiring any order to show cause issued under section 790.06 to "contain a statement of the acts or practices alleged to be unfair or deceptive." (Stats. 2000, ch. 280, § 1, p. 2475.)[12]

**Read as a whole, the UIPA did not give the Commissioner authority to promulgate the Regulation**

The Commissioner has only the authority conferred on him by the Legislature. (*Payne*, *supra*, 16 Cal.3d at p. 656 ["The commissioner, of course, has no power to vary or enlarge the terms of an enabling statute [citation], or to issue regulations which conflict with this or any other statute."].) We deduce that authority from the language of the statute itself by applying familiar maxims of statutory construction.

In doing so, we give the language its plain meaning. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.) We credit all language in a statute lest we render portions of the statute surplusage. "Moreover, it is equally well settled that fundamental rules of statutory construction require ascertainment of the legislative intent 'so as to effectuate the purpose of the law [and] "every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." [Citation.] If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. [Citation.]'" (*Kaiser Steel Corp. v. County of Solano* (1979) 90 Cal.App.3d 662, 667.) To the extent a statute addresses one subject but not another, we assume that choice was deliberate under the principle of "*[e]xpressio unius est exclusio alterius*. The expression of some things in a statute necessarily means the exclusion of other things not expressed." (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 852.)

---

[12] A copy of the Analysis of Senate Bill No. 1500 (1999–2000 Reg. Sess.) by the Senate Committee on Insurance, as amended March 28, 2000, is attached as exhibit C to the Associations' request for judicial notice filed on April 7, 2014, which request we granted on February 20, 2015.

**The Commissioner's reliance on section 790.10 does not sufficiently credit other portions of the UIPA and is not consistent with the structure of the UIPA**

The Commissioner is correct that the purpose of the UIPA is to regulate insurance practices "in the public interest." That is what section 790 does when it refers to "the Act of Congress of March 9, 1945." That act (15 U.S.C. § 1011) states in pertinent part that "the continued regulation . . . by the several States of the business of insurance is in the public interest." To the extent the Commissioner cites *Calfarm*, *supra*, 48 Cal.3d 805, for the proposition that it may promulgate Regulations that serve the public interest, *Calfarm* does not illuminate what is already in the UIPA.[13]

The language of the UIPA reveals the Legislature's intent to set forth in the statute what unfair or deceptive trade practices are prohibited, and not delegate that function to the Commissioner. Thus, section 790.02 states, "No person shall engage in this State in any trade practice which is defined *in this article* as, or determined *pursuant to this article* to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." (Italics added.)

In section 790.03, the Legislature has defined "as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance" numerous acts or practices, including, among other acts or practices, making false statements "as to the dividends or share of surplus previously paid on similar policies" (subd. (a)); entering into a boycott (subd. (c)); making "any false statement of financial condition of an insurer with intent to deceive" (subd. (d)); "willfully omitting to make a true entry of any material fact pertaining to the business of the insurer in any book . . . of the insurer" (subd. (e)); unfairly discriminating "between individuals of the same class and equal expectation of life" in life insurance rates (subd. (f)(1)); representing that one is a member of the California Insurance Guarantee Association or insured against insolvency

---

[13] *Calfarm* is otherwise not on point. There, the Supreme Court invalidated two provisions of Proposition 103 regarding insurance rates (§ 1861.01 et seq.) as unconstitutional. (48 Cal.3d at pp. 815–816.)

(subd. (g)); and "[k]nowingly" committing one or more of sixteen "unfair claims settlement practices" set forth in subdivision (h). These are in addition to section 790.03, subdivision (b), at issue here, as to disseminating a "statement . . . which is untrue, deceptive, or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue, deceptive, or misleading."

In addition, section 790.036, subdivision (a) provides that advertising insurance that the insurer does not sell is also "an unfair and deceptive act or practice." There is no similar provision in the UIPA regarding the content and format of replacement costs estimates. This demonstrates that the Legislature was deliberate in choosing what conduct to brand in sections 790.03 and 790.036 as "unfair and deceptive." Applying the legislative maxim of *expressio unius est exclusio alterius*, we can infer that the absence of a provision regarding replacement cost estimates was a deliberate choice. Thus, the Commissioner did not have authority to add content and format requirements for replacement cost estimates in homeowner insurance to the list of practices set forth in section 790.03 under the guise of deeming nonconforming estimates misleading under section 790.03, subdivision (b).

Our conclusion is bolstered by those provisions in the UIPA actually denominating the Commissioner's powers. These focus on the Commissioner's power (1) to enforce existing prohibitions in the UIPA (§§ 790.035, 790.04, 790.05, 790.07,[14] 790.08); (2) to bring enforcement proceedings against a person the Commissioner has "reason to believe" is engaging "in any method of competition or in any act or practice . . . not defined in Section 790.03 . . . that . . . is unfair or deceptive" (§ 790.06); and (3) to "promulgate reasonable rules and regulations" to administer the act (§ 790.10). Read together, these provisions demonstrate that the Legislature did not give the Commissioner power to define by regulation acts or conduct not otherwise deemed unfair or deceptive in the statute.

---

[14] Section 790.07 regards violations of a cease and desist order issued pursuant to section 790.05 or a court order issued pursuant to section 790.06.

Thus, section 790.04 gives the Commissioner "power to examine and investigate into the affairs of every person engaged in the business of insurance . . . in order to determine whether such person has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice *prohibited by Section 790.03 or determined pursuant to this article* to be an unfair method of competition or an unfair or deceptive practice in the business of insurance." (Italics added.)

Section 790.05 sets forth an enforcement process when the Commissioner has "reason to believe that a person has been engaged . . . in any unfair method of competition or any unfair or deceptive act or practice *defined in Section 790.03*, and that a proceeding by the commissioner in respect thereto would be to the interest of the public." That process includes an order to show cause hearing after the Commissioner has served that person with a statement of the charges and the person's potential liability under section 790.035. The hearing is conducted under the auspices of the Administrative Procedure Act (APA) (Gov. Code, § 11500 et seq.), and any resulting order is reviewable by a court as provided by Insurance Code section 12940 or the APA. The Commissioner's remedies include civil penalties as provided in section 790.035, subdivision (a),[15] and a cease and desist order.

The Commissioner's argument that incomplete replacement cost estimates are within the ambit of "untrue, deceptive, or misleading" statements in section 790.03, subdivision (b) proves too much. If that were the case, there would be no need for the Regulation because, as the Commissioner points out, he would already have had the means in section 790.05 to assess penalties and issue a cease and desist order against a

---

[15] Section 790.035, subdivision (a) provides: "Any person who engages in any unfair method of competition or any unfair or deceptive act or practice defined in Section 790.03 is liable to the state for a civil penalty to be fixed by the commissioner, not to exceed five thousand dollars ($5,000) for each act, or, if the act or practice was willful, a civil penalty not to exceed ten thousand dollars ($10,000) for each act. The commissioner shall have the discretion to establish what constitutes an act. However, when the issuance, amendment, or servicing of a policy or endorsement is inadvertent, all of those acts shall be a single act for the purpose of this section."

24

licensee the Commissioner believed had given a lowball or incomplete estimate in selling homeowner insurance.

The Commissioner's reliance on section 790.10 also appears circular. As set forth in the preceding discussion, section 790.03 lists specific insurance industry conduct that the Legislature has deemed unfair and deceptive. Replacement cost estimates are not included in that list. The Commissioner argues that, because he believes replacement cost estimates not following the Regulation's format and content rules are automatically "misleading" under section 790.03, subdivision (b), he has authority to regulate such estimates under his powers of administration in section 790.10.

This interpretation of the UIPA is not only circular, it also renders section 790.06 superfluous. Put differently, under the Commissioner's interpretation of its authority under the UIPA, he would never have to resort to the procedures in section 790.06 regarding practices not "defined" in 790.03 because the Commissioner could always argue that conduct not meeting standards in a regulation promulgated under the cover of the Commissioner's power to administer under section 790.10 would be "misleading." This is precisely what the Commissioner has done here.

Section 790.06 provides for more multifaceted procedural processes than required by section 790.05 before any conduct identified by the Commissioner not within 790.03 can be sanctioned. Thus, in addition to an order to show cause hearing under the APA, if the conduct is found to be "unfair or deceptive," the Commissioner is required to issue a written report "so declaring." If the conduct has not been discontinued, the Commissioner may, through the Attorney General, petition the superior court to enjoin the conduct. Unlike a proceeding under section 790.05, the Commissioner cannot enjoin the purportedly unfair or deceptive conduct without a court order.

Under the heading of "Powers vested in commissioner," section 790.08 provides in pertinent part that "[t]he powers vested in the commissioner in this article shall be additional to" the penalties and other remedies "authorized by law with respect to the methods, acts and practices *hereby declared to be unfair or deceptive*." (Italics added.)

25

Thus, section 790.08 emphasizes that the enforcement role of the Commissioner is tethered to acts and practices "hereby declared to be unfair or deceptive," to wit, defined or determined in the UIPA.

The Commissioner places great reliance on *Ford Dealers*, *supra*, 32 Cal.3d 347, in arguing that omitting information can be misleading and the Commissioner has "discretion" to fill in the "details" as to what is misleading under section 790.03 even if the particular insurance act or practice is not listed in section 790.03. In *Ford Dealers*, the Supreme Court held that the director of the Department of Motor Vehicles (DMV) had the authority to promulgate a regulation requiring, among other things, licensed automobile dealers to disclose certain added-on delivery and preparation charges where the enabling statute, Vehicle Code section 11713, subdivision (a), made unlawful the dissemination of "any statement which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

Like 790.03, subdivision (b), at issue before us, Vehicle Code section 11713, subdivision (a) is followed by subdivisions identifying other prohibited practices. These include advertising using fonts and a format other than those specified in the statute (subd. (b)); failing to withdraw an advertisement for a vehicle within 48 hours after the vehicle has been sold (subd. (c)); not having the required bond (subd. (e)) and "established place of business" (subd. (f)); including licensing or transfer of title fees which are not due to the state (subd. (g)); and employing an unlicensed salesperson (subd. (h)). Vehicle Code section 11713, subdivision (a) also makes unlawful the dissemination of a misleading statement as "part of a plan . . . with the intent not to sell any vehicle or service so advertised at the price stated therein, or as so advertised."[16]

In upholding the regulation, the Supreme Court reasoned that an "administrative agency is not limited to the exact provisions of a statute in adopting regulations to

---

[16] In addition, division 5, chapter 4, article 1 of the Vehicle Code, of which section 11713 is a part, contains a myriad of other statutory obligations pertaining to automobile sales and dealers. (Veh. Code, §§ 11700–11740.)

enforce its mandate," and the absence of any specific statutory provision regarding the subject of the regulation did not mean that the agency did not have authority to promulgate it. (*Ford Dealers*, *supra*, 32 Cal.3d at p. 362.) Notably absent from the statutory regime at issue in *Ford Dealers* were provisions distinguishing between procedures to be employed regarding acts or practices defined by the statute to be unfair and deceptive, and those acts or practices not so defined in the statute, but nonetheless believed by the administrative agency to be similarly unfair and deceptive.[17] We do not doubt that the Legislature could have delegated to the Commissioner the kind of broad authority conferred on the DMV in *Ford Dealers*; it did not do so in the UIPA.

*Payne*, *supra*, 16 Cal.3d 651, offers no more support for the Commissioner's position. There, the Supreme Court upheld the Commissioner's authority to limit the amount of compensation paid to agents in the sale of credit life and credit disability insurance. In *Payne*, the Supreme Court primarily addressed the necessity of the regulation—finding that the administrative record supported the Commissioner. As noted *ante*, the Associations have not attacked the Regulation on necessity grounds.

The *Payne* court observed that under statutes governing credit insurance, the Legislature evidenced its intent to "grant the commissioner broad discretion to determine what reasonable rules and regulations in the area of credit insurance are necessary to promote the public welfare." (*Payne*, *supra*, 16 Cal.3d at p. 656.) The Commissioner had authority to promulgate the regulation because the credit insurance statutes gave the Commissioner power under section 779.21 to adopt regulations "'as may be necessary *to carry out* the provisions of [the article relating to credit insurance],'" and under section 779.9 to disapprove a credit insurance form if it contains provisions that are "'unjust,

---

**17** The Vehicle Code provisions at issue in *Ford Dealers*, *supra*, 32 Cal.3d 347, also contain different enforcement procedures from those in the UIPA. For example, Vehicle Code section 11726 provides for a civil action for damages, attorney fees, and injunctive relief for any licensee "suffering pecuniary loss because of any willful failure by any other licensee to comply with any provision of Article 1 . . . ." There is no analogous provision in the UIPA.

27

unfair, inequitable, misleading, deceptive . . . or are contrary to any provision of the Insurance Code *or of any rule or regulation promulgated thereunder.*'" (*Payne*, at p. 656, italics added.)

Once again, these statutes governing credit insurance do not contain the same language or fit into the same statutory context as section 790.03 does in the UIPA. Accordingly, *Payne* is of limited value to the present analysis—to discern whether in giving the Commissioner power to administer the UIPA in section 790.10, the Legislature intended to give the Commissioner power to define content and format rules for replacement cost estimates and render them "misleading" under section 790.03, subdivision (b) just because the estimates did not follow those rules.[18]

**The legislative evolution of the UIPA as well as other sections in the Insurance Code support the conclusion that the Commissioner was without authority to promulgate the Regulation**

The UIPA as originally enacted in 1959 (Stats. 1959, ch. 1737, § 1, p. 4187) did not include all the acts and practices currently deemed unfair and deceptive in section 790.03. It also did not include section 790.10. That section first appeared in the UIPA in 1971. (Stats. 1971, ch. 975, § 1, p. 1887.) When the Legislature was considering Assembly Bill No. 1353, which proposed to add section 790.10, the Assembly Committee on Finance and Insurance's summary included the following statement: "This bill gives the Insurance Commissioner the authority to promulgate rules and regulations so that if the need therefor arises, he can, without delay, promulgate necessary rules making such practices definite and specific for the benefit of the public without

---

[18] We note that Justice Mosk dissented in *Payne*, arguing that there was "no direct legislative authority justifying an enforceable order" other than "two very general authorizations of power." (*Payne*, *supra*, 16 Cal.3d at p. 659 (dis. opn. of Mosk, J.).) Indeed, Justice Mosk asserted that the majority opinion was contrary to the Supreme Court's "converse conclusion" in *Pac. Tel. & Tel. Co. v. Public Utilities Com.* (1950) 34 Cal.2d 822 under an even more broadly worded enabling statute applied to a Public Utilities Commission regulation regarding payments for services provided by a telephone company's parent company that could be passed on to consumers. (*Payne*, at p. 660.)

having to wait for the Legislature to act at a later date." (Assem. Com. on Finance and Insurance, summary of Assem. Bill No. 1353 (1971 Reg. Sess.) p. 1.)[19]

On initial review, this statement of legislative purpose would support the Commissioner's interpretation of his authority to promulgate the Regulation defining noncomplying replacement cost estimates as "misleading" statements under section 790.03. However, the Legislature's subsequent additions to section 790.03 are not consistent with this view.

We observe that section 790.03, subdivision (h), regarding unfair claims settlement practices, was added to the UIPA in 1972. (Stats. 1972, ch. 725, § 1, p. 1314.) Section 790.03, subdivision (h) covers categories of claims settlement practices that could have been regulated under the Commissioner's interpretation of his authority under sections 790.03 and 790.10 without amending the statute. Consider section 790.03, subdivision (h)(1), regarding "[m]isrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue," as one such example.

Similarly, in 1975, the Legislature added definitions (14) and (15) to subdivision (h) of section 790.03, respectively regarding "advising a claimant not to obtain the services of an attorney" and "[m]isleading a claimant as to the applicable statute of limitations." (Stats. 1975, ch. 790, § 1, p. 1812.) Under the Commissioner's view of his authority, the Commissioner could have defined these practices in a regulation and then denominated them as misleading under section 790.03, subdivision (b) without waiting for enabling legislation.

Indeed, in response to complaints about underinsurance regarding the same wildfires that ultimately led to promulgation of the Regulation, the Legislature in 2005 amended section 2051.5 (Stats. 2005, ch. 447, § 3, p. 3608) and added section 1749.85

---

[19] On our motion, we take judicial notice of this summary and the other legislative reports and analyses discussed in this opinion.

29

(Stats. 2005, ch. 447, § 2, p. 3608).[20]  As noted earlier, section 2051.5, subdivision (a) defines replacement cost.  The 2005 amendments to subdivision (b)(2) of section 2051.5 expanded alternative living expense payments in the event of a state of emergency.  Section 1749.85, subdivision (a) tasked the curriculum committee to make recommendations on training broker-agents on "proper methods of estimating the replacement value of structures, and of explaining the various levels of coverage under a homeowners' insurance policy."

We observe that section 1749.85, subdivision (c) states that nothing in "[t]his section" shall be construed to prevent "licensed appraisers, contractors and architects from estimating replacement value of a structure," but that if they do, subdivision (d) authorizes the Department of Insurance to adopt a regulation "establish[ing] standards for the calculation" of such estimates.  Not even the Commissioner argues that section 1749.85, subdivision (d) authorized the Commissioner to promulgate the Regulation, but at trial the Commissioner asserted that the latter statute supported subdivision (k) of the Regulation regarding, among other things, training of broker-agents.  Although neither section 2051.5 nor 1749.85 is part of the UIPA, the Legislature could have acted at the time of these 2005 amendments to legislate the form and content of replacement cost estimates, given consumer complaints about underinsurance, of which the Legislature was well aware, but it did not do so.

Similarly, section 10101, which was added to the Insurance Code in 1992, requires residential property insurers to provide written disclosures in the format specified in section 10102.  (Stats. 1992, ch. 1089, § 1, p. 5031.)  Section 10102, subdivision (a), which was added to the Insurance Code in 2010—the same year in which the Regulation was promulgated—sets forth the content of the required disclosure, including informing

---

[20] The author of the legislation commented on the many complaints about "the underinsurance problem" and that "[b]etter and continued training of personnel in how to estimate the replacement cost of a home is therefore critical."  (Sen. Banking, Finance and Insurance Committee, Rep. on Sen. Bill No. 2 (2005–2006 Reg. Sess.) as amended Mar. 29, 2005, p. 7.)

the consumer that the coverage "'should be high enough so you can rebuild your home,'" itemizing the kind of rebuilding costs a consumer should anticipate, and warning the consumer to obtain insurance in a sufficient amount to cover those costs. (Stats. 2010, ch. 589, § 2, No. 9 West's Cal. Legis. Service, p. 3024.) Section 10103, subdivision (a)(2) further provides that no residential property insurance "may be issued or renewed" unless it recites "'[t]he limit of liability for this structure (Coverage A) is based on an estimate of the cost to rebuild your home, including an approximate cost for labor and materials in your area, and specific information that you have provided about your home.'" (Stats. 2006, ch. 137, § 2, p. 1779.)

The Legislature could have gone on to define the content and format of replacement cost estimates. It could have added incomplete replacement cost estimates to the list of unfair and deceptive practices in the UIPA. We infer that these omissions were deliberate, and that under the guise of "filling in the details," the Commissioner therefore could not do what the Legislature has chosen not to do.

By our opinion today, we are not suggesting that the Legislature could not regulate the form and content of replacement cost estimates if it chooses to do so. We are also not suggesting that the Commissioner could not use the administrative and court processes in section 790.06 to seek a determination that replacement cost estimates not including certain information are unfair and deceptive. Nor are we limiting the Commissioner's authority under section 790.05 to bring an enforcement action against a licensee who has lowballed or otherwise given an incomplete replacement cost estimate. Our ruling today is limited to one conclusion—that the UIPA has not as of yet given the Commissioner authority to regulate the content and format of replacement cost estimates. Because we conclude that the Commissioner did not have the authority to promulgate the Regulation, we do not reach the Associations' other arguments.

31

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.


                                            BENDIX, J.*

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

32